**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

NIKIA EDWARDS, on behalf of herself
and others similarly situated,

      Plaintiff,

v.                                         Civil Action No. 2:20cv192

OPTIMA HEALTH PLAN and
SENTARA HEALTH PLANS, INC.,

      Defendants.

**OPPOSITION TO MOTION TO CONDITIONALLY CERTIFY CLASS**

      Defendants Optima Health Plan and Sentara Health Plans, Inc ("Optima") file their

Opposition to Plaintiff's Motion for Step One Notice (the "Motion") and state as follows:

**PRELIMINARY STATEMENT**

      The Plaintiffs are four former employees of Optima who claim they were misclassified as

exempt from overtime.  Two of the Plaintiffs have a Master's Degree or Ph.D. in counseling,

while the other two are RNs with a Bachelor's degree in nursing.  All were licensed.  Perhaps the

main legal question in this case will be whether medical professionals with advanced degrees and

licensures like Plaintiffs, who are clearly exempt when working in a clinical setting, are also

exempt when they work for a health insurer.  The Fourth Circuit has already decided this issue,

ruling that licensed RNs working for an insurer are exempt.  *Williams v. Genex Services, LLC*,

809 F.3d 103 (4th Cir. 2015); *See also, Isett v. Atena Life Ins. Co.*, 947 F.3d 122 (2d Cir. 2020).

Recognizing that they have little chance of demonstrating that the *Plaintiffs* were improperly

classified as exempt, Plaintiffs seek certification of a class that would potentially include

*hundreds* of employees working in 43 separate job codes, including jobs with vastly different

duties, some that do not require an advanced degree, and even some that rely on different legal

exemptions.  Plaintiffs no doubt hope that the expense of conducting discovery and seeking

Summary Judgment on such a large group of disparate jobs will force Optima into a settlement.[1]

Plaintiffs ask the Court to conditionally certify and send notice to hundreds of employees

who work or worked under the following general job titles:  Authorization Coordinator ("AC"),

Clinical Claims Reviewer ("CCR"), Transition Care Coordinator ("TCC"), Integrated Care

Manager ("ICM"), Pre-Authorization Coordinator, Behavioral Health Utilization Management

Care Coordinator ("BHUMCC"), and any other position that performs what Plaintiffs call "Care

Management" work.  This is a term Plaintiffs created that does not accurately describe what *any*

of these positions do, let alone all of them.

Plaintiffs falsely claim that *all* of the employees in *all* of these positions do the "same"

work.  (Pl. Brief at p. 2).  However, simply saying that hundreds of employees in 43 job codes do

the same job does not make it so.  Instead, Plaintiffs bear the burden of producing real evidence

that *all* of the employees in all of these positions were subjected to a common unlawful policy

and have jobs and work environments that are sufficiently similar to make the class manageable.

As described below, the employees Plaintiffs try to group together include work in roles that

perform completely different tasks, in different locations, with some working in an office on

---

[1]This strategy has been successful in recent years.  A multitude of managed care companies have been targets of similar litigation, and many have found it necessary to settle in order to avoid costs of a large and unwieldly class.  These settlements almost always involve negligible awards to individual plaintiffs but large awards to their lawyers.  Indeed, Plaintiffs' counsel in this case previously filed a similar suit against Optima.  After the parties agreed to a class that involved only one position, one that did not require an advanced degree, Optima and Plaintiffs agreed to a settlement.  As part of the settlement, Optima converted these employees to non-exempt in order to avoid the possibility of another lawsuit concerning the same position.  One of the ironies of exemption litigation is that the current employees almost never *want* to be converted to hourly and non-exempt.  They view themselves (correctly) as medical professionals who should not have to punch a time clock.  Indeed, when Optima notified the class from the previous case that it was converting the position, many expressed outrage and asked why Optima had not fought harder to keep treating them like the professionals they were.  In misclassification cases, it is often only the law firm and *former* employees who want the position changed to non-exempt.

I-1704362.18

purely internal matters, and others working on the road where they directly meet with and advocate for members with a host of health conditions.  These jobs have vastly different educational and licensure requirements, some rely on totally different exemptions, and two job titles are even classified as non-exempt.

Of course, if the Court only read Plaintiffs' Brief and declarations, it would have no way to know who is potentially in the class, what they do, and under what circumstances they do it. This is because Plaintiffs have utterly failed to meet their burden of providing *any* non-conclusory evidence that would demonstrate sufficient similarity between these positions and employees.  This failure to provide evidence is fatal to Plaintiffs' Motion.  *Yerger v. Liberty Mutual Group, Inc.*, 2011 WL 5593151, *5-6 (E.D.N.C. 2011).

Plaintiffs' first alleged "evidence" includes a series of job descriptions they pulled from the internet, with most coming from a jobsite called GlassDoor.  Plaintiffs do not even reference these third-party job descriptions in their declarations, much less explain how these job description show similarity or even to whom they apply.  It appears that two of them relate to the position at issue in the *Brunty* case, which are specifically exempted from the putative class in this case, and others use titles that are not used by Optima.  In any case, all of the job descriptions are unauthenticated hearsay that should be struck, and Courts have repeatedly held that job descriptions are not determinative of similarity for purposes of conditional certification.

Plaintiffs' declarations fare no better.  Plaintiffs submitted four nearly identical boilerplate declarations that provide no detail about what even they did, much less the hundreds of other employees working in a variety of different roles.  Indeed, other than the BHUMCC and ICM job titles, the declarations do not even mention the remainder of the general job titles. Thus, they have not produced even conclusory "evidence" related to the Authorization

Coordinator, Pre-Authorization Coordinator, CCR, or TCC positions.  Even for their own general job titles (ICM and BHUMCC), they fail to inform the court that there are multiple distinct and different jobs within these titles, or to provide any detail about what, if any, of the roles (including their own) actually did.

The failure to provide evidence is perhaps not surprising. First, they could not possibly have actual knowledge about what these jobs do.  Edwards and Harris were each employed in one office, for less than six months, with their employment ending in *2018.*  Preau-Grier and Andaluz were also short-term employees who worked in one region in the same job code. One left Optima in August 2018 and the other in March 2019.  Of Optima's 43 distinct job codes that fall under the job titles in the putative class, the four Plaintiffs filled *only three of them.*  Second, even for the limited jobs about which Plaintiffs might have some knowledge, it would be impossible to provide details about these jobs without highlighting the drastic differences between most of them.

Plaintiffs *could* have waited until after discovery to file this Motion, using information learned in discovery to propose a more limited class.  They chose to file this Motion pre-discovery because it allows them to take advantage of a more lenient evidentiary burden. However, their lack of knowledge has apparently left them unable or unwilling to provide *any* relevant evidence about the similarity between the hundreds of employees in dozens of job codes, and this failure dooms their Motion.  Plaintiffs will no doubt respond that there is no harm in certifying an overbroad class, since the Court could decertify the class after discovery and summary judgment.  Indeed, the Plaintiffs flippantly state on page 5 of their brief that "the risk of error is insignificant."  This could not be further from the truth here.  The expansion from four plaintiffs to potentially hundreds will increase the costs exponentially.  It will burden the Court

and parties with countless discovery motions, and potentially with dozens of separate Motions for Summary Judgment, all before an opportunity for decertification arises.[2]  Given the Plaintiffs' complete failure to provide any evidence in support of their Motion, and the likelihood of summary judgment under *Genex*, the Court should not authorize their massive fishing (and settlement) expedition.  *See Lang v. DirecTV, Inc*., No. 10-1085, 2011 WL 6934607 at *6 (E.D. La. Dec. 30, 2011) ("[A] decision to certify, even if subject to correction at the decertification stage, is not without consequences" as "too much leniency at the notice stage can lead to a frivolous fishing expedition… at the employer's expense.")

Plaintiffs' Motion should be denied because (1) they have failed to produce any admissible and non-conclusory evidence, (2) the putative class is not close to being sufficiently similar, (3) the Plaintiff and/or Plaintiffs are not representative of the class they seek to certify, (4) the certification would not be manageable given the substantially different factual and legal issues involved, and (5) Plaintiffs have failed to demonstrate sufficient interest in the class.

## **LEGAL FRAMEWORK**

The decision to conditionally certify and authorize notice to a collective action class is by no means automatic.  As this Court has noted, "the approval of notice is not mandatory, but rather discretionary."  *Bernard v. Household Int'l, Inc.*, 231 F. Supp. 2d at 435 (E.D. Va. 2002).  Indeed, the decision to create an opt-in class remains soundly within the discretion of the Court. *Hoffman-La Roche v. Sperling*, 493 U.S. 165, 170 (1989).  Notice and class certification is only

---

[2] The irony and disingenuousness of Plaintiffs' argument that all jobs at a health insurer perform effectively the same job will no doubt be shown at the summary judgment phase.  The Fourth Circuit has already held in *Williams v. Genex* that a case manager for a health insurer is exempt. Preau-Grier and Andaluz performed case management duties for Optima.  Of course, at the Summary Judgment phase, Plaintiffs will argue that the highly individualized nature of FLSA exemption cases renders *Williams* not applicable to their jobs based on the individualized circumstances that are so critical to each single Plaintiff in an FLSA case.

5

appropriate when it will promote the goals of the FLSA—i.e. to preserve judicial economy. *Id.* Where a class is sufficiently dissimilar such that a court would have to conduct multiple individualized inquiries, conditional certification is not appropriate. *Purdham v. Fairfax Cnty. Pub. Sch.*, 629 F. Supp. 2d 544, 547-52 (E.D. Va. 2009).

Among other requirements, a plaintiff seeking conditional certification and notice must produce actual evidence that *all* potential class members were subjected to a "common unlawful policy" and are "similarly situated" in terms of duties, work environment, legal issues, and other aspects of employment. *Id.* at 547. Courts in this circuit have regularly refused to grant conditional certification when the plaintiff fails to meet its burden. *E.g., Id.; Ceras-Campo v. WF P'ship*, 2011 WL 588417, *4 (E.D.N.C. 2011) (denying conditional certification for Plaintiff's failure to show that similarly situated parties existed); *Yerger*, 2011 WL 5593151 (same).

Demonstrating a common illegal policy and sufficient similarity requires more than "mere allegations" and "factual evidence is necessary." *Purdham,* 629 F. Supp. 2d at 548. A plaintiff's mere assertion in a declaration that others are similarly situated is "not a talisman that convert[s] Plaintiff's individual claim into a collective action." *Ceras-Campo*, 2011 WL 588417 at * 4. When (as here) Plaintiffs offer no more than conclusory assertions of similarity, without providing sufficient detail about job duties, work, and circumstances of potential class members, class certification and notice are *not* appropriate. *Yerger*, 2011 WL 5593151 at *5-6.

Plaintiffs have attempted to group together dozens of disparate jobs that stretch any concept of "similarity" well past the breaking point. They have produced no admissible and non-conclusory evidence in support of their attempt. Accordingly, their Motion should be denied.

# FACTUAL BACKGROUND

## I.      Optima

Optima manages health insurance-related plans and services, including employer-sponsored plans, individual and family health plans, employee assistance plans, and plans serving Medicare/Medicaid enrollees.  While Plaintiffs absurdly suggest that nearly all of Optima's hundreds of exempt employees perform the "same" job (*see* Pl. Brief at pg. 2), like most large businesses, Optima employs a variety of specialized employees with vastly different job functions working in different business lines.  (*See* Dec. of Branae Obenauer, Ex. 1 at ¶ 2.)

Some of these functions could *generally* be said to fall within the general concept of "Utilization Review."  Although there are numerous distinct jobs and roles within Utilization Review, this concept refers to the process of determining whether a medical procedure, service, or benefit will be authorized as medically necessary and paid for by the health plan.  (*Id.* at ¶ 5.) Employees performing Utilization Review typically have no contact with members, work in an office setting, and work a typical business schedule.

Other of Optima's functions can generally be said to fall within the concept of Case Management.  Although there are numerous distinct Case Management roles, Case Management job duties are drastically different than Utilization job duties.  For example, in its role managing certain Medicare programs, Optima is expected to assign a Case Management worker whose job is to serve as an advocate and advisor for members.  (*Id.* at ¶ 4.)  Most Case Management focused employees do *not* work in an office, and spend the majority of their time traveling around the state to meet with members, their families, and in some cases their providers.  After meeting with members and reviewing their medical history, a Case Management focused employee will prepare or evaluate a comprehensive care plan, ensure that the member is aware of resources and treatment that could be available to them, follow up on that treatment with the

member, and other similar functions.  While Utilization involves an internal process of deciding whether one specific treatment should be covered at a single point in time, Case-Management is externally focused on ensuring that members are well-cared for and fully taking advantage of available treatment and resources that could improve their health.

Given the vastly different goals of their jobs, it is not surprising that Case-Management work and Utilization work involve the use of completely different guidelines and produce completely different work product.  For example, compare the attached work product of a Case Management focused employee with that of a Utilization employee (Ex. 1 at Ex. A and B).  It is clear that, while both employees use their medical backgrounds and exercise discretion, they are performing vastly different roles.  (*Id.* at ¶ 4-5.)

Case Management and Utilization Review are broad concepts that encompass many distinct specialized jobs.  Some lower-level utilization jobs are performed by hourly clerical employees and involve data entry and little analysis.  On the other extreme, some utilization jobs involve specialized types of cases (such as behavioral health only) and require professionals with advanced degrees who exercise almost constant discretion about medical necessity.  Likewise, jobs that perform Case Management functions are highly diverse, with some being non-exempt, some allowing only licensed medical professionals, some in traditional office settings with traditional hours, while others work exclusively "in the field" meeting directly with members and their families.  Complicating factors even more, at certain times, a few positions performed both utilization and case management duties.  (*Id.* at ¶¶ 6-7, 9-14, 20-26, 31-32.)  Without producing any evidence about these distinctions and multiple specialized roles, Plaintiffs ask the Court to certify a class that includes every utilization role *and* every case management role.

## II.    Factual Background Regarding Lack of Interest in this Case

This is not the first case that Plaintiffs' counsel has brought against Optima. On May 15, 2019, Monica Brunty filed a collective action against the same Defendants, alleging the same overbroad class.  The *Brunty* litigation was eventually limited to an agreed class of one single position, Care-Coordinator Non-RN, a position (unlike Plaintiffs' positions) that did not require a license or an advanced degree.  Since early 2019, counsel has been advertising and attempting to contact potential plaintiffs for both the *Brunty* case and this case.[3]

Despite over eighteen months of advertising and communicating with potential plaintiffs, counsel has only found four plaintiffs, each a short-term former employee, and each of whom worked in a position that is clearly exempt under Fourth Circuit and similar precedent.  *See Williams*, 809 F.3d 103; *Isett*, 947 F.3d 122.

### III.    Background on Plaintiffs and their Proposed Class

Named Plaintiff Nikia Edwards filed the present lawsuit on April 16, 2020.  Edwards was only employed by Optima for a brief period from June through November 2018.  (Ex. 2 at ¶ 13). She worked at Optima's Military Circle office, and was employed at all times as a BHUMCC.[4] *Id*.  Natalie Harris, another BHUMCC, joined the lawsuit a few days after it was filed.  Harris was only employed from June through December 2018.  *Id*.

In her initial Complaint which has since been amended, Plaintiff alleged that as a BHUMCC she performed "utilization reviews," which she asserted involved "reviewing health insurance benefit requests submitted by health care providers against predetermined guidelines and criteria for insurance coverage and payment purposes."  She alleged that BHUMCCs, CCRs, and ACs also performed identical Utilization Review work, and asked that she be allowed to sue

---

[3] See e.g. http://www.4overtimelawyer.com/optima-health-lawsuit/
[4] Although Plaintiffs list a variety of other job titles they claimed they worked under, and regardless of any nicknames they allege were used for their job, they at all times worked under the job title of BHUMCC.

on behalf of all such employees.  (*See* ECF 1 at ¶ 9).  In their few months of employment in 2018, Edwards and Harris would have had little to no interaction with most of the positions and locations they now claim perform the exact "same" work as they did.  (Ex. 1 at ¶ 8.)  Edwards and Harris would have no first-hand knowledge about job duties or requirements at Optima after December 2018 (*Id., E*x. 2 at ¶ 13).

Subsequently, two other former Optima employees, Edna Preau-Grier and Andrea Andaluz, filed consents to join the litigation.  Both were employed under the broad Integrated Care Manager job title.  Preau-Grier was employed from September 2017 through August 2018 and Andaluz from September 2017 through March 2019.  (Ex. 1 at ¶ 16).  Both performed vastly different jobs than those performed by Edwards and Harris.  Andaluz and Preau-Grier were remote field workers performing strictly Case Management work, not Utilization Review.  Unlike Edwards and Harris, who worked in an Optima office in Tidewater and referred to themselves as utilization review employees in the initial complaint, Andaluz and Preau-Grier worked from their homes in Chester and Richmond and spent much of their time traveling around central Virginia to meet with members. (Ex. 1 at ¶ 16; Ex. 2 at ¶ 13).

Plaintiff's initial Complaint asked the Court to certify a class of utilization review employees.  The initial Complaint did not even reference Case Management, or Plaintiffs' new made up term of "*Care* Management" work.  The Complaint did not include ICMs in its list of positions in the putative class.  It is clear that Andaluz and Preau-Grier did not fit in this already overbroad class of disparate Utilization Review jobs.  Thus, Plaintiffs amended the Complaint, now asserting in a grossly overbroad fashion that nearly all Optima exempt employees should be grouped together in a class that includes *both* Utilization and Case Management jobs.  (*See* ECF 21 at ¶ 3).  Without any detailed factual support, Plaintiffs assert that all Optima employees

perform effectively the same job which they titled "Care Management" work. (*Id.* at ¶ 8). This is not a term of art used by Optima to refer to any group of employees, let alone all of them.

Plaintiffs ask the Court to conditionally certify and send notice to all "*Care* Management employees" which they assert in their Motion/Complaint (but not their declarations) includes at least the following job titles: BHUMCCs, ICMs, CCRs, TCCs, ACs, and Pre-ACs.[5] (*See* ECF 26 at 2). Other than stating in a declaration in a conclusory fashion that all CME employees perform the same job, Plaintiffs provide the Court no evidence to explain anything about these separate jobs, let alone the 43 separate job-codes that fall under these general titles. However, as described in Optima's declarations and below, this grossly overbroad class includes employees with such profound differences, that class treatment would be highly inappropriate.

## IV. Factual Background Regarding Jobs in Plaintiff's Proposed Class

Plaintiffs assert on page 2 of their brief (again, not in their declarations) that there is a "pervasive" practice in the managed care industry of using many separate job titles that all refer to the same job. Plaintiff seems to imply that this is somehow part of a common scheme by managed care companies to hide their alleged misclassification of workers. Plaintiffs represent to the Court, without any detailed factual support, that all of the job titles listed in their Motion/Complaint perform the *same* job duties regardless of the job title or code. (*Id.* at 2-3).

Not only have Plaintiffs failed to provide evidentiary support for this supposed "job title" scheme, but if anything, Optima's practices are in the opposite direction. As described below, Optima uses relatively few official job titles. Within most of these broad job titles, there are

---

[5] Plaintiffs reference in various places other job titles that do not exist as job titles at Optima, although some may have been used as a nickname to describe one of the many distinct jobs within a general job title. These references to non-existent Optima job titles likely result from the pattern of using boilerplate pleadings utilized in other filings, without even attempting to discover the distinctions between completely separate businesses or jobs.

numerous distinct jobs that have different "job codes" applied to them.  Under the six broad job titles in the putative class, there are 43 job codes and a variety of distinct roles.  For example, Edwards and Harris performed a BHUMCC role that performed primarily utilization review with a minimal amount of specialized case management.  (Ex. 2 at ¶ 8).  Currently, there is a distinct BHUMCC role that only performs utilization review work. (*Id.* at ¶ 8).  Other BHUMCC jobs performed only Case Management duties.  Another BHUMCC role is performing a complex medical document review project.  (*Id.* at ¶ 9).  Likewise, the ICM position has numerous separate job codes, with some performing purely Case Management, others performing purely Utilization Review, and others working on special projects.  *Id.*  Even within these subcategories, there are ICMs working in different locations, on different contracts, and with different Optima products.  *Id.*

It is worth noting that most of the unauthenticated job descriptions Plaintiffs attach as exhibits are *not* even Optima job descriptions.  The job descriptions provided come from GlassDoor, a website that aggregates information to advertise third-party jobs.  These postings have multiple errors and inaccuracies.  For example, they list a non-existent job entitled "RN Care Coordinator."  These unofficial, unauthenticated, and inaccurate job descriptions also fails to even include a standard "job skills" section—which Optima includes in its job descriptions.  Further demonstrating the lack of care in utilizing these descriptions, two of the descriptions appear to relate to the position from the lawsuit in *Brunty*, which is specifically exempted from this class.  In any case, Courts have long held that simply producing job descriptions does not demonstrate similarity of a class.  *E.g., Forney v. TTX Co.*, 2006 WL 1030194, at *3 (N.D. Ill. Apr. 17, 2006) ("Whether similarly situated employees exist depends on the employees' actual qualifications and day-to-day duties, rather than their job descriptions).

12

A.      *BHUMCC Job Title and Examples of Differences from Other Positions*

While there is one general BHUMCC job title, there are several distinct jobs and job codes under this title with vastly different duties.  The jobs vary significantly, and have changed substantially since Edwards and Harris left Optima.  However, all BHUMCC jobs are unique from other job titles at Optima based on the educational requirements alone.  Unlike other jobs, the BHUMCC position relates exclusively to members receiving behavioral health services. (Ex. 2 at ¶ 5).  Thus, the BHUMCC position requires an employee to have a Master's Degree in social work or counseling or at least a four-year bachelor's degree in nursing.  In all cases, a BHUMCC must have at least 2 years of experience in behavioral health.  (*Id.* at ¶ 6).  Edwards had a Ph.D. and was a Licensed Counselor.  Likewise, Harris had a Master's Degree and was a Licensed Professional Counselor.  (*Id.* at ¶ 13).  On the opposite end, the Authorization Coordinator jobs ("AC" and "Pre-AC") that Plaintiff seeks to lump into the same class do not require even a four year degree and do not require licensure as a nurse (an LPN degree will suffice).  (Ex. 3, at ¶ 22).  Thus, these jobs would not even focus on the same primary FLSA exemptions, with the ACs having been exempt primarily under the administrative exemption while the BHUMCC was exempt under (without limitation) the professional exemption.

Clearly jobs that will not even be analyzed under the same exemption cannot be similarly situated.[6]  *See Aguirre v. SBC Commc'ns, Inc.*, 2007 WL 772756 at *15 (S.D. Tex. Mar. 12, 2007) (holding that "[g]iven the fact-intensive nature of the exemption analysis, the plaintiffs have not

---

[6] Similarly, while all ICMs, CCRs, and TCCs must be *licensed*, a BHUMCC with a Master's Degree or higher and who is working towards Virginia licensure is permitted to perform certain jobs within the general BHUMCC job.  Once again, this will result in separate arguments related to the exemption.  While the ICM, CCR and TCC will no doubt rely heavily on 29 C.F.R. §541.301(e)(2), the unlicensed BHUMCC job (which is itself distinct from other BHUMCC jobs) will rely more generally on the Master's level education per 29 C.F.R. § 541.301(a)-(c).  Such distinctions in the both the factual and legal arguments that will be at issue show the hopelessness of conducting a coherent class litigation in this highly individualized matter.

shown that they are similarly situated so as to make collective treatment of their claims proper");
*Morisky v. Pub. Serv. Elec. And Gas Co.*, 111 F. Supp. 2d 493, 499 (D.N.J. 2000) (noting the inefficiency in misclassification cases because "[t]he exempt or non-exempt status of potentially [thousands] of employees would need to be determined on… an employee-by-employee basis.").

Although Harris and Edwards could not know this (since they left Optima in 2018), the BHUMCC position has changed markedly over time and includes (or has included) several distinct jobs.  (Ex. 2 at ¶ 9, 13).  Harris and Edwards worked in a BHUMCC role that at the time performed primarily utilization review tasks with very minimal specialized case management functions.  However, after they left, this role stopped performing even the specialized and minimal case management functions.  Currently there is a distinct BHUMCC role that only performs utilization work and that analyzes service authorization requests that provide medical information about the member and the member's health and decide whether to approve or recommend these requests for rejection.  (*Id.* at ¶ 8).

After Edwards and Harris left Optima, unlicensed BHUMCCs filled a new role performing strictly case management work related to behavioral health.  (*Id.* at ¶ 9).  Subsequently a new role has been created in which unlicensed BHUMCCs are working on a special safety initiative project, performing completely separate job tasks from all other BHUMCCs, from the jobs held by Plaintiffs, and the other jobs Plaintiffs attempt to aggregate.  These BHUMCCs (who are permitted to be working towards their licensure) have been tasked with using their Master's level education and experience to review a substantial body of medical literature.  This job is more akin to a Masters' Level scientific study than the work being performed by other BHUMCCs.  (*Id.* at ¶ 9-10).

While all BHUMCCs use their education and experience to exercise discretion related to members with behavioral health issues, a review of some of their guidelines and work product

shows how different job duties are even within the BHUMCC general job title.  For example, a BHUMCC performing utilization review compares medical information provided by a behavioral health practitioner against Department of Medical Assistance Service ("DMAS") guidelines for medical necessity related to the requested service.  The employee then prepares either an approval or recommendation for denial.  (Ex. 2 at ¶ 8, and Ex.2 at Ex. A).  On the other hand, a Case Management BHUMCC does not typically refer to DMAS and creates work product markedly different from the utilization BHUMCC (*Id., Ex.* 1 at ¶ 6).

All BHUMCC roles focus exclusively on behavioral health members, and are office positions located in Tidewater with a traditional schedule with supervisors nearby.  (Ex. 2 at ¶ 11).  This is drastically different than certain ICMs (such as Preau-Grier and Andaluz) and other positions that handle cases outside of behavioral health, who have traveling schedules, and who have work schedules and locations that can vary drastically by day.

### B.    *Integrated Care Manager*

Like the BHUMCCs, the Integrated Care Manager job title actually comprises several distinct jobs under a number of sub job codes.  All ICMs must be licensed RNs and have at least 3 years of nursing experience.  (Ex. 1 at ¶ 9).  This makes the job completely different from ACs, who are currently non-exempt and do not require an advanced degree or license.  (Ex. 3 at ¶ 22-26).  In addition, unlike the BHUMCC job title, all ICMs must be licensed.  As described above, this results in distinct legal arguments for exemption.  *See Aguirre*, 2007 WL 772756 at *15; *Morisky,* 111 F. Supp. 2d at 499.

Andaluz and Preau-Grier have no knowledge of ICM's current duties and organization structure as the ICM position has changed since they were employed with Optima.  (Ex. 1 at ¶ 16).  Both Andaluz and Preau-Grier served in an ICM role performing case management duties in which they directly traveled to members, analyzed their medical histories, treatment, and

I-1704362.18

current symptoms, and helped craft and maintain a care management plan to ensure these complex patients received proper care at the correct time. *Id.*

There is also a separate group of ICMs who perform only utilization review. These office-based ICMs review medical notes, applicable guidelines, and exercise their own professional discretion to determine whether treatment is medically necessary and appropriate and should be approved. (Ex. 1 at ¶ 17-19). This job is not member facing, does not require travel, and does not entail preparing care plans. Its work product is distinct. (*Id.* at ¶ 17, 18).

Further demonstrating the complexity of Optima's separate jobs under the same general job title (and the inappropriateness of class treatment), there is a distinct ICM role in which employees work on a special project focused on reducing recidivism. These employees perform completely different functions than the other positions. (*Id.* at ¶ 14). Plaintiffs would have no knowledge of these jobs since they were not even employed when it was created. (Ex. 1 at ¶ 16).

### C.      Authorization and Pre-Authorization Coordinators

ACs and Pre-ACs are two jobs that perform purely utilization functions. These positions have no place in this litigation for a variety of reasons. First, unlike any of Plaintiffs' jobs (or any other job in the putative class), the AC jobs have been *non-exempt* since early 2019. (Ex. 3 at ¶ 26). Second, unlike any of the jobs held by Plaintiffs or listed in the putative class, the AC job does not require an advanced degree or license. (*Id.* at ¶ 22). Thus, while all of the other jobs in the class would rely upon (without limitation) the professional exemption, the AC jobs would primarily (without limitation) rely on the administrative exemption. *See Morisky,* 111 F. Supp. 2d at 499 (rejecting certification where different exemption arguments would apply).

Although ACs perform a type of utilization work, the job is distinct from even the other utilization jobs Plaintiffs attempt to lump together. ACs also have almost nothing in common with employees who perform purely case management work. (Ex. 3 at ¶ 27). The ACs are the

16

first line of utilization analysis, conducting a threshold review to determine if the member is active, the provider is in network, and the clinical information from the provider allows the AC to determine whether it meets clinical guidelines for medical necessity.  They have the authority to determine whether many requests should be approved.  If a case may be appropriate for denial, they forward the case to another utilization employee with an RN degree.  (Ex. 3 at ¶ 24).

Although these positions were appropriately classified as exempt prior to their 2019 reclassification, Plaintiffs would presumably assert that the lack of RN degree and extra layer of approval above them render these positions distinct even from other utilization positions.  Of course, this is one of many reasons they cannot be in a class with the other positions listed by Plaintiffs.  Indeed, Plaintiffs do not even mention this position in their declarations.  *Purdham,* 629 F. Supp. 2d at 547-52) (holding that conditional certification is not appropriate where class would require multiple, individualized inquiries); *Morisky,* 111 F. Supp. 2d at 499 (holding same).

### D.    *Transition Care Coordinators*

TCC is a field-based position with the distinct, specialized job of helping members transition in and out of hospitals and care facilities.  TCCs serve in a different role than any other position, performing what is known as transition care coordination.  While this sounds like case management, this term actually has a different meaning in the industry.  TCCs are required to have their Bachelor's level RN degree, three years of nursing experience, and must be licensed.  Once again, this distinguishes TCCs from both ACs (no degree) and the distinct BHUMCC role with advanced degree but no licensure.  (Ex. 1 at ¶ 20-21).

The TCCs assess a member's needs while transitioning into a new environment, frequently into or out of the hospital and/or a long term nursing facility.  TCCs communicate directly with the hospital or nursing facility's medical team and therefore must use their clinical

knowledge when analyzing an appropriate plan.  The TCC organizational structure is dependent

on their region. (*Id.*at  ¶ 21-24).  For example, in the Southwest and Central regions, the TCCs

are divided by the facilities with which they work.  There are two types of TCCs: 1. Acute and 2.

Skilled Nursing Facility TCCs.  TCCs evaluate the care that the member needs or any new

circumstances presented by the new environment.  The TCCs make recommendations based on

their assessment and assist the member in getting the proposed additional services.  *Id.*

TCCs are all field-based employees, distinguishing them from all office based positions.

Given that TCCs are a separate position with a distinct task of serving members during a very

specific time, they are not properly grouped with the other job positions who (for example) serve

members at their homes, who work in an office, who only communicate internally, or who

perform utilization work.  Indeed, Plaintiffs do not even reference this position in their

declarations.  (*Id.* at ¶ 25-28*).*

### E.     *Clinical Claims Reviewers*

Finally, CCRs complete vastly different tasks than each of the other job positions

mentioned.  CCRs perform medical coding functions.  They receive post-service claims and use

their clinical background coupled with their significant medical coding knowledge to review and

analyze the claim information and provider documentation.  CCRs have significant educational

and other qualification prerequisites.  They must have a license, a Bachelor's level nursing

degree and at least 3 years of acute care experience. Finally, unlike any other position, they must

be (or become) a Certified Professional Coder ("CPC").  (Ex. 3 at ¶ 19).

CCRs review the coding and the bundling of services to determine if the service did in

fact meet medical necessity. The cases that go to CCRs are intricate cases that fail to pass initial

review and which often involve difficult questions of how to properly code medical treatments or

conditions that do not easily fit into any category.  CCRs utilize Milliman guidelines ("MCG"),

combined with their own clinical experiences and their full understanding of the member's clinical records.  The CCR will then analyze the service for medical necessity and appropriate coding.  CCRs also use a different software system than most of the other jobs in the putative class, further demonstrating its distinct role.  Most jobs use a software system called PCS Symphony.  The CCRs use a separate system called Macess.  CCRs also work a unique schedule.  Often, they work 2-3 days a week at home, and the other days in the office. (*Id. at* ¶ 20)

<u>**ARGUMENT**</u>

**I.      The Various Jobs are Not Similarly Situated**

A.      <u>Plaintiffs' Declarations Are Woefully Insufficient</u>

Plaintiff bears the burden of proving that the putative class is similarly situated to her. This requires more than "mere allegations," and "factual evidence is necessary."  *Bernard*, 231 F. Supp. 2d at 435.  Critically, conclusory statements in boilerplate declarations are *not* sufficient evidence to support conditional certification of a large class of including multiple job titles in multiple locations.  *Palacios v. Boehringer., Inc.*, 2011 WL 6794438, at *5 (S.D. Fla., 2011) (rejecting boilerplate declarations and noting "federal courts routinely decline to certify collective action when the plaintiff's assertions are conclusory or lack evidentiary foundation"). *Augusyniak v. Lowe's Home Center, LLC*, 2016 WL 462346 (W.D. NY 2016) (same).

Plaintiffs' "evidence" consists entirely of (1) unauthenticated, inaccurate hearsay job descriptions largely coming from GlassDoor[7], and (2) four boilerplate and largely identical declarations that provide virtually no detail on Plaintiffs' job duties, let alone the job duties of the 40 other job codes.  Courts routinely refuse to grant conditional certification where the Plaintiffs fail to provide sufficient detail in their declarations, where declarations are boilerplate,

---

[7] Indeed, Glass Door specifically disclaims the accuracy of information on its site, stating "we make no guarantees about the accuracy, currency, suitability, reliability or quality of the information" including job postings.  https://www.glassdoor.com/about/terms.htm

or where declarations do not show sufficient knowledge of the jobs claimed to be similarly situated. *See e.g.  Purdham*, 629 F. Supp. 2d at 548; *Holmes v. Quest Diagnostics, Inc.*, 2012 WL 12876965 (S.D. Fla, 2012).

The deficiencies in Plaintiffs' declarations are frankly breathtaking.  In their brief and Amended Complaint, Plaintiffs lump all positions (whether utilization review or case management, office or field based, licensed or unlicensed) under a made up defined term of "Care Management" employees or "CMES".  However neither a brief nor a complaint is "evidence."  While the Plaintiffs' declarations adopt the term "CMEs," they never define what it means, which job titles or sub job codes fall within this made up term, or what specific duties or work environments any specific job or worker performs.  Indeed, while Plaintiffs' brief and complaint asks this Court to include Pre-ACs, ACs, CCRs, and TCCs in their huge class, **they do not even *mention* these job titles in their declarations, let alone describe what these jobs do.**

The declarations go on to provide exactly *one sentence* in which they purport to describe the complete set of duties performed by hundreds of employees in seven separate job titles and literally dozens of separate sub-job codes.  (*See E.g.,* Edwards Dec. at 2).  The rest of the declarations contain conclusory boilerplate allegations designed to portray all so-called "CME" employees as being constrained by "policies and "guidelines" an issue that relates not to similarity but to exempt status.  Of course, the declarations do not name or describe such guidelines, or begin to explain the different guidelines that apply depending on position.  Almost the entire declarations are in the first person, and none attempt to describe the way some of the jobs have changed over time, likely because none of the Plaintiffs know this detail.  Indeed, the Plaintiffs claim that they "understand that Defendant has employed at least 100 CMEs in Virginia that work/worked under the same or similar conditions as I did."  However, they do not

20

describe these "conditions" or "recall the names" of *any* such employees, and provide no details about what job titles these employees worked under or what these jobs entailed. *See Wombles v. Title Max of Alabama, Inc.*, 2005 WL 3312670, (M.D. Ala. Dec. 7, 2005) (holding that five nearly identical affidavits alleging that affiants "believe . . . that given the opportunity" others would join the lawsuit, insufficient because of affiants' inability to name more than *two* of them.)

In fact, if the Court granted Plaintiffs' Motion and ordered that *all* employees in these job titles be sent notice, this would be many hundreds of employees.  The Court could not possibly determine which of these employees (if any) are actually similar to Plaintiffs or each other, because the Plaintiffs have failed to provide the Court *any* evidence to allow it to understand what it is getting itself, or Optima, into.

The complete lack of "evidence" and deficiencies in the declarations are made even more glaring by the fact that the declarations are nearly identical.  Other than changing the Plaintiffs' name, overtime hours claimed, and work location, the declarations simply repeat the same allegations even though the ICM plaintiffs performed drastically different jobs than the BHUMCC.  (See Ex. 4, redlined comparisons of declarations).  Under these circumstances, Courts routinely refuse to grant conditional certification.  For example, in *Holmes*, the Court found that the plaintiff could not establish similarity when it only provided 23 identical affidavits using generalized terms was devoid of sufficient particularity to grant conditional certification. 2012 WL 12876965 at *2.  *See also Palacios,* 2011 WL 6794438, at *2 (also noting that court strongly disapproves of boilerplate declarations); *Manzi*, 2011 WL 2672343, at *3; *Augusyniak*, 2016 WL 462346.

Plaintiffs have entirely failed to meet their burden of producing sufficient evidence to demonstrate the similarity of hundreds of employees in numerous locations and distinct jobs.

I-1704362.18

They only produced a few inadmissible, unauthenticated, hearsay job descriptions, and four boilerplate declarations which do not even reference most of the job titles their attorneys seek to include in the class, much less what any of the job titles actually do.  Having chosen not to provide any factual detail or relevant evidence, their Motion should be denied.

Moreover, Plaintiffs should not be permitted to provide "evidence" for the very first time in their Reply Brief, and Optima objects to any attempt to do so.  *See Continental Tire North America, Inc. v. Transportation Solutions, Inc.,* 2007 WL 4287520 (W.D. N.C. Dec. 4, 2007) (citing *Black v. TIC Investment Corp*., 900 F.2d 112 (7th. Cir. 1990) (striking evidence because it was raised for the first time in a reply brief).

B.       The Jobs Plaintiffs attempt to Group are Substantially Dissimilar

The determination of whether employees are similarly situated "depends on the employees' actual qualifications and day-to-day duties, rather than their job descriptions." *Fortney v. TTX Co.*, 2006 WL 1030194 at *3 (N.D. Ill, 2006).  *See also Wade v. Werner Trucking Co.,* 2012 WL 5378311 at *4 (S.D. Ohio Oct. 31, 2012).  When a Plaintiff alleges that the entire proposed class was misclassified as exempt, if the defendant produces evidence that the jobs performed different functions, then the evidence weighs against conditional certification.  *See e.g. Bramble v. Wal-Mart Stores, Inc.*, 2011 WL 1389510, *7 (E.D. Pa. 2011); *Yerger,* 2011 WL 5593151 at *6, (E.D.N.C. 2011) (denying conditional certification where evidence showed that Plaintiff's "individual work was substantially different from the class members that she seeks to represent").  While Plaintiffs' declarations are devoid of any factual detail to support the conclusory allegation that nearly all of Optima's hundreds of employees perform effectively the same job, Optima's declarations and documents provide in great detail just how different the various roles are from each other and from the specific BHUMCC and ICM sub-job codes that the Plaintiffs held.  Some of these differences are summarized below:

22

- **Vastly Different Tasks and Work Product:**
  - ACs provide first level utilization reviews, and play no role in case management (performed by certain ICMs and BHUMCC), transition care coordination (performed by TCCs), or complex medical coding (CCRs). Ex. 3 at ¶ 22-27.
  - CCRs are the only employees who are specialists in complex medical coding. They have no member interaction. CCRs play no role in case management, and work in a different software system than almost all of the other positions. Ex. 3 at ¶ 19-21.
  - The ICM job performed by Preau-Grier and Andaluz was a traveling case management job, meeting with members and helping ensure an appropriate care plan was in place. Ex. 1 at ¶ 16. This is vastly different from purely utilization ICM jobs and ICM jobs (of which they have no knowledge) working on special projects.
  - The BHUMCC job that Harris and Edwards worked in during their few months with Optima was primarily a utilization review position. The BHUMCC position has undergone significant changes since their employment. Ex. 2 at ¶ 13. This job performed different tasks than a traveling case management position, a coding position, a lower level authorization job, or a transition care coordination position. Ex. 2 at ¶ 13.
  - *See Yerger,* 2011 WL 5593151, at *5 (denying certification due to dissimilar duties).
- **Different Guidelines and Training:**
  - The various positions utilize different guidelines and training. For example, an employee performing utilization review uses DMAS guidelines. Case management employees use completely different forms and workflows, and do not use DMAS guidelines like utilization review workers. Ex. 2 at ¶ 8. CCRs use detailed medical coding guidelines. Ex. 3 at ¶ 19. They also each undergo various types of training and the complexity and length of the training varies depending on the position. Ex. 2 at ¶ 14; Ex. 3 at ¶ 16, 19.
  - Since Plaintiffs assert that the reasons these licensed medical professionals are non-exempt despite their advanced degrees is because they are allegedly constrained by guidelines and workflows, these differences create highly individualized circumstances that defeat any efficiencies of such an overbroad class. *Purdham,* 629 F. Supp. 2d at 547-52.
- **Different Educations/License Requirements and Exemption Arguments**
  - The education and license requirements are different for each position, and therefore different exemption arguments will apply. ACs require no advanced degree and are already classified as non-exempt. Ex. 3 at ¶ 22, 26. BHUMCCs are required to have clinical experience as well as a Master's level degree in a Behavioral Health field. Ex. 2 at ¶ 6. ICMs must be RNs with significant nursing experience. Ex. 1 at ¶ 9. Finally, CCRs are unique from all other positions in that they must get CPC certified within their first year. Ex. 3 at ¶ 19.
  - *Romero v. H.B. Auto. Group, Inc.*, 2012 WL 1514810 at *12 (S.D. NY 2012) ("It is axiomatic that 'where a collective action contains a mix of employees, some of whom are classified as exempt from the FLSA's requirements, and some of whom are classified as non-exempt, there is no factual nexus between the collective action members' situations, and conditional certification is not appropriate.'")
- **Different Locations, Supervisors and Schedules:**
  - The positions that Plaintiffs attempt to group together work in various geographic locations, in numerous offices, and the job duties can vary by the region the employee is serving. Ex. 1 at ¶ 21. Further, even within the same job title, some employees are working in a traditional office setting while others are field-based with home offices and extensive travel schedules to visit members. Ex. 1 at ¶ 4, 12-14, 25. *Syrja v. Westat, Inc.,*

756 F. Supp. 2d 682 (D. Md. 2010) (holding that different locations and schedules cut against similarity); *Purdham*, 629 F. Supp. 2d at 547-52.

## II.      Plaintiffs Have Not Established that The Class are All Victims of a Common Policy

To prevail on a motion for conditional certification, Plaintiffs must establish that they and the putative class members are victims of a common policy or plan that violated the law. *Ceras-Campo*, 2011 WL 588417, at *2. *See also Casanova v. Gold's Tex. Holdings Grp., Inc.* 2014 WL 6606573, *2 ("If the plaintiffs cannot show that the . . . 'putative class members were together the victims of a single decision, policy, or plan' that violates the FLSA, the court **should not** conditionally certify the class.")

Plaintiffs point to no common policy or plan other than that a large group of disparate jobs each happen to be exempt from overtime.  However, courts have routinely held that being classified as exempt is not by itself sufficient to demonstrate a common policy, plan, or practice that renders all putative class members as similarly situated.  *Colson v. Avnet, Inc.,* 687 F. Supp. 2d 914, 927–28 (D. Ariz. 2010); *Brown v. Barnes & Noble, Inc.*, 252 F. Supp. 3d 255, 262 (S.D.N.Y. 2017) ("Defendant's classification of [putative class members] as exempt, standing alone, is insufficient to satisfy the low threshold for conditional certification").

This case is quite similar to that addressed by the Court in *Colson.*  In *Colson*, the Plaintiff sought conditional certification and notice to a class of approximately 470 sales employees Defendant had classified as exempt.  The Plaintiff submitted a small number of affidavits in which they asserted that the "common policy" was the decision to treat employees as exempt.  The affidavits also provided some level of detail on what the Plaintiff herself did, but offered only conclusory assertions that all other employees performed substantially similar work. The Court in *Colson* explained its denial of conditional certification as follows:

> When pared down to its most essential elements, Plaintiff's argument in favor of collective action is that because Defendant classified all of its SMR employees as exempt, and because

24

all SMR employees perform essentially the same tasks nationwide, these elements standing alone justify the Court in conditionally certifying a nationwide class for notification purposes under the FLSA…  First, mere classification of a group of employees as exempt does not automatically dictate, as a matter of law, whether collective action notification is appropriate…  Focusing on a uniform exemption policy alone does little to further the ... assessment of the relationship between individual and common issues.  Second, Plaintiff's evidentiary showing that SMRs performed the same job duties is plainly insufficient, even under the most liberal legal standard.  While the standard for conditional approval at [this] stage of the litigation is lenient, it does require some evidentiary support… the mere classification of a group of employees—even a large or nationwide group—as exempt under the FLSA is not by itself sufficient to constitute the necessary evidence of a common policy, plan, or practice that renders all putative class members as "similarly situated" for § 216(b) purposes. If it were, in every instance where an employer is accused of misclassifying a large group of employees, the district court would then somehow be required to order collective action notification, irrespective of the quality or quantity of evidence that had been produced in the form of declarations and supporting exhibits. Such a rule would run counter to the long established law governing § 216(b) actions, which states that whether an employee has been properly exempted under the FLSA necessitates a fact specific inquiry.  *Colson*, 687 F. Supp. at 927-29 (internal cites and quotes omitted).

The Court went on to explain that the three affidavits were clearly insufficient evidence of a common policy or similarly situated positions.  While the plaintiff in *Colson* did describe her own role with specificity (unlike the Plaintiffs here), she offered only conclusory allegations regarding what others did.  As such, the Court denied class certification.  As in *Colson* and the other cases cited above, Plaintiffs in this case have neither identified a sufficient common policy nor provided sufficient evidence of job similarity, and their Motion should be denied.

### III.   The Named Plaintiff and Opt-In Plaintiffs Are Not Adequate Class Representatives

The named Plaintiff was only employed for 5 months in one position at one location. None of the opt-in Plaintiffs have worked at Optima since March 2019 and none were long tenured employees.  Of the 43 job codes they attempt to group together, the four Plaintiffs have only worked in three of these codes.  Further, Plaintiffs say *nothing* in their declaration about having firsthand knowledge about any of the other positions.  Not only have Plaintiffs not provided actual declaration testimony about what any of these jobs actually do, they *could not possibly do so for many of the jobs*. Even for the jobs that existed as of early 2019, Plaintiffs

would only have knowledge about a small number of these positions.  (Ex. 1 at ¶ 8, 17; Ex. 3 at ¶ 16-17.)  Under these circumstances, it is clear that none of the Plaintiffs would be an adequate class representative for the class they want certified.  As such, their Motion should be denied. *Yerger*, 2011 WL 5593151, at *3; *Purdham*, 629 F. Supp. 2d  at 548. *See also Wilson v. Navika Capital Group, LLC,* 2011 WL 3020876, *3 (S.D. Tex. July 22, 2011) ("plaintiffs must offer some evidence that the proposed class, as a whole, is made up of individuals that *are* similarly situated to them.").

## IV.    Judicial Economy is Not Served by Collective Action Treatment

If the putative class is not actually similarly situated, as is the case here, the Court will need to engage in individualized analyses regarding each possible plaintiff, therefore defeating the purpose of class certification.  The FLSA provides courts with the discretion to use collective actions as a case management tool when it serves judicial efficiency.  *Yerger*, 2011 WL 5593151, at *3 ("[w]hether to grant conditional certification is within the discretion of the district court").  As this Court has held, judicial efficiency "cannot be met without allowing the court to manage the process of notification and joinder of additional parties." *Bernard*, 231 F. Supp. 2d at 435. Even at the initial stage of certification, Plaintiffs must demonstrate "identifiable facts or legal nexus [that] bind the claims so that hearing the cases together promotes judicial efficiency." *McKnight v. D. Houston, Inc.*, 756 F. Supp. 2d 794, 801 (S.D. Tex. 2010).

As this Court has also noted "where a trial would require 'individualized determinations to resolve the claims of each Plaintiff, [such as here] certification  as a collective action may be inappropriate." *Purdham*, 629 F. Supp. 2d at 547.  Courts have been particularly hesitant to conditionally certify classes in misclassification cases where the employees are classified exempt, but allege, based on their individual experiences, that they should not have met the exemption standard.  *Id. See also Bramble,* 2011 WL 1389510; *Babin v. Stantec Inc.*, 2010 WL

26

3363920 (E.D. Pa. 2010) (refusing to conditionally certify due to substantial differences among the job duties performed by the individuals); *Mike,* 274 F. Supp. 2d at 216 (denying conditional certification because Plaintiff "was effectively challenging his individual treatment," and the court would "have to engage in an ad hoc inquiry for each proposed Plaintiff to determine whether his or her job responsibilities were similar"); *Morisky*, 111 F. Supp. at 499 (noting the inefficiency in misclassification cases because "[t]he exempt or non-exempt status of potentially [thousands] of employees would need to be determined on… an employee-by-employee basis.").

Collective action treatment is particularly inappropriate when the Defendants assert different exemptions apply to the different job positions.  *See Aguirre*, 2007 WL 772756 at *43 (holding that "[g]iven the fact-intensive nature of the exemption analysis, the plaintiffs have not shown that they are similarly situated so as to make collective treatment of their claims proper").

In this case, Plaintiffs attempt to include in their class positions that would be analyzed under different exemption arguments, and in some cases, different exemptions altogether.  The ACs, for example, have no advanced degree and Optima will primarily rely on the administrative exemption.  On the other hand, the other positions all require advanced degrees and Optima will primarily rely on the professional exemption.  For RN only positions, Optima will rely on 29 CFR 541.301(e) which *specifically provides that nurses are generally exempt.*  For positions that also allow Master's Degrees without licensure, Optima will rely on other provisions in the regulations.

Plaintiffs make clear that they plan to argue that, despite the high level educational and licensure requirements of most positions in the putative class, these employees were allegedly so constrained to follow internal guidelines and policies, that they could not exercise the discretion sufficient to be exempt.  However, as described herein, the various positions utilize different guidelines and training and each the discretion afforded to each position and sub-position will therefore need to be analyzed separately.  The Plaintiffs will no doubt argue on summary judgment

27

that the fact that one position or sub-position is clearly exempt, should not mean that all other positions are. At that stage, they will point to the profound difference in work circumstances, locations, roles, and guidelines to justify why they should survive on one employee's claim even if they do not on another. Due to the vast differences in the jobs, this case would not create judicial efficiency, but would instead potentially subject the parties and the Court to massive discovery and the possibility of dozens of Motions for Summary Judgment. A case such as this one is therefore highly inappropriate for collective certification. *Morisky*, 111 F. Supp. 2d at 499.[8]

## V.     Plaintiff's Counsel Attempts to Garner Interest in the Lawsuit have Largely Failed

In order to proceed under Section 216(b) of the FLSA, Plaintiff must show, with more than personal beliefs, that there are a sufficient number of other individuals interested in joining the litigation. *Pfohl v. Farmers Ins. Group*, No. 03-3080, 2004 WL 554834, *10 (C.D. Cal. March, 1, 2004) ("notice should be denied because Plaintiff has engaged in solicitation and has failed to come up with significant numbers of allegedly similarly situated employees who are likely to assert similar claims"); *Horner v. U.S. Auto Ass*., 279 F. Supp. 2d 1231, 1236-37 (M.D. Ala. 2003) (holding that Plaintiff's belief that there are similarly situated employees who would join the lawsuit is insufficient to demonstrate interest); *O'Donnell v. Robert Half International, Inc.,* 429 F. Supp. 2d 246, 250-51 (D. Mass. 2006) (finding Plaintiff's statement that he "is familiar with other current and former employees" and "believes many of these people would be interested" cannot establish sufficient interest).

Despite attempting to gather plaintiffs for over a year and half, dating back to before the filing of the *Brunty* case, Plaintiffs' counsel has only found four plaintiffs, all former employees,

---

[8] Plaintiffs cite a variety of cases in which Courts have certified a class in a managed care setting. However, all of these cases are distinguishable, either because the class was not as large, the plaintiffs had firsthand knowledge and produced actual evidence of similarity, or the defendants admitted to similarity between roles. For example, in *Pettenato v. Beacon Health Options, Inc.*, the court placed substantial weight on more substantial affidavits and job descriptions.

who filled only three of the 43 job codes they try to group together.  The four plaintiffs are almost certainly exempt under the Fourth Circuit's clear ruling in *Williams v. Genex* that insurance RN case managers are exempt professionals and in *Isett* that utilization review RNs are exempt.  *Williams v. Genex Services, LLC*, 809 F.3d 103; *Isett v. Atena Life Ins. Co.*, 947 F.3d 122.  With such limited interest in the case, and such a low likelihood of success on the merits, this Court should not sanction the Plaintiffs' seven figure fishing expedition.  *Lang v. DirecTV, Inc.*, No. 10-1085, 2011 WL 6934607 at *6 (E.D. La. Dec. 30, 2011).

## CONCLUSION AND REQUEST FOR RELIEF

Plaintiffs have fallen far short of meeting even the relatively light burden of demonstrating that conditional certification and notice to hundreds of employees is appropriate.  Their boilerplate and largely identical declarations utterly fail to provide any "evidence" that the multiple job titles, and dozens of distinct job codes within these job titles, are actually similar.  Indeed, Plaintiffs fail to even mention in their declarations the CCR, TCC, AC, or Pre-AC positions.  As for the distinct ICM and BHUMCC roles they occupied, they spend a grand total of one conclusory sentence explaining what their own job entailed, and fail to provide evidence that would rebut the vast differences between the various jobs that fall under these general titles.  Plaintiffs have no firsthand knowledge of the majority of jobs and employees they attempt to include in their class, and have totally failed to provide evidence of a common policy that affected all of these employees in the same way.  Plaintiffs have had little success finding other plaintiffs and cannot name a single person who is interested in joining.

The putative class would have so many separate and distinct issues that the costs of discovery and summary judgment would be overwhelming, and the issues and even exemptions involved would require dozens of individualized determinations.  Certifying this class will not promote efficiency, but instead will require analysis of dozens of separate jobs, in separate

locations, subject to separate guidelines and policies, producing vastly different work, with significantly different educational requirements.  Plaintiffs, who have not produced any evidence of similarity, should not be given the gift of a million dollar[9] fishing expedition designed to make this case too expensive to litigate.

For all of these reasons, we respectfully request that the Court deny Plaintiffs' Motion and all the relief requested therein.  The case can then proceed forward to discovery and summary judgment with just the current plaintiffs.  If Defendants prevail, all parties will have avoided a massively expensive litigation, and presumably Plaintiffs' counsel would have much less interest in pursuing further claims regarding the other positions they claim are so similar.  Of course, if Plaintiffs prevail, nothing stops their counsel from later attempting certification with different plaintiffs and a more reasonable class based on actual knowledge of job duties.[10]

---

[9] This is not hyperbole.  In numerous similar managed-care cases in which Defendants have found it necessary to settle before obtaining a ruling on exempt status, the plaintiffs' have sought approval of settlements in which their fees greatly exceeded $1,000,000, often with the actual plaintiffs only getting a few thousand each.  This does not count fees that such defendants had to pay their own counsel.

[10] If the Court orders notice, the Court should require the parties to meet and confer to adopt a notice form substantially equivalent to that to which they agreed in the *Brunty* litigation.

OPTIMA HEALTH PLAN and
SENTARA HEALTH PLANS, INC.

By     /s/ David A. Kushner
    David A. Kushner (VSB # 71173)
    William M. Furr (VSB # 29554)
    Cameron A. Bonney (VSB # 90574)
    Matthew K. Sarfan (VSB # 94979)
    Counsel for Optima Health Plan and
    Sentara Health Plans, Inc.
    WILLCOX & SAVAGE, P.C.
    440 Monticello Avenue, Ste. 2200
    Norfolk, Virginia 23510
    (757) 628-5500 Telephone
    (757) 628-5566 Facsimile
    dkushner@wilsav.com
    wfurr@wilsav.com
    cbonney@wilsav.com
    msarfan@wilsav.com

I-1704362.18

## CERTIFICATE OF SERVICE

I hereby certify on the 28th day of August, 2020, I will electronically file the foregoing

with the Clerk of the Court using the CM/ECF system, which will then send a notification of

such filing (NEF) to the following:

Harris D. Butler, III (VSB No. 26483)
Zev H. Antell (VSB No. 74634)
Paul M, Falabella (VSB No. 81199)
BUTLER ROYALS, PLC
140 Virginia Street, Suite 302
Richmond, Virginia 23219
Tel: (804) 648-4848
Fax: (804)237-0413
harris.butler@butlerroyals.com
zev.antell@butlerroyals.com
paul.falabella@butlerroyals.com

Travis M. Hedgpeth (*Admitted Pro Hac Vice*)
The Hedgpeth Law Firm, PC
3050 Post Oak Blvd., Suite 5l0
Houston, Texas 77056
Tel: (28l) 572-0727
travis@hedgpethlaw.com

Jack Siegel  (*Admitted Pro Hac Vice*)
Stacy Thomsen  (*Admitted Pro Hac Vice*)
Siegel Law Group PLLC
4925 Greenville Avenue | Suite 600
Dallas, Texas 75206
Tel: (2l4)  790-4454
jack@siegellawgroup.biz

_____/s/ David Kushner_____
David A. Kushner (VSB #71173)
William M. Furr (VSB # 29554)
Cameron A. Bonney (VSB # 90574)
Matthew K. Sarfan (VSB # 94979)
Counsel for Optima Health Plan
 and Sentara Health Plans, Inc.
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Ste. 2200
Norfolk, Virginia 23510
(757) 628-5500 Telephone
(757) 628-5566 Facsimile
dkushner@wilsav.com
wfurr@wilsav.com
cbonney@wilsav.com
msarfan@wilsav.com

32

I-1704362.18