# **EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

NIKIA EDWARDS, on behalf of herself
and others similarly situated,

    Plaintiff,

v.   Civil Action No. 2:20cv192

OPTIMA HEALTH PLAN and
SENTARA HEALTH PLANS, INC.,

    Defendants.

### DECLARATION OF ANDREA COSTEN

Pursuant to 28 U.S.C. § 1746, I, Andrea Costen, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge:

1. My name is Andrea Costen and I am the Director of MLTSS Care Services for Utilization at Optima Health.

2. I have been with Optima since 2008.

3. In this and prior roles, I have managed a variety of Optima employees and am familiar with employees serving under the following job titles: Integrated Care Managers (ICMs), Clinical Claims Reviewers (CCRs), Authorization Coordinators, and Pre-Authorization Coordinators. However, as described below, Optima uses very general job titles across multiple business lines. There are many separate and distinct jobs that fall under some of these broad job titles. For example, under the ICM job title, I worked with numerous employees who perform a purely utilization review role, determining if a medical service was/is medically necessary, appropriate, and covered by the applicable plan. However, there are other ICMs that perform nothing but case-management related functions.

1

4. The MLTSS department is responsible for managing various Medicare and Medicaid plans for the Commonwealth of Virginia, and for providing certain services directly to members of these plans. The MLTSS department consists of a separate management and reporting structure than that of the Behavioral Health department, in which Behavioral Health Utilization Management Care Coordinators are located. They have different managers who ultimately report to the Clinical Vice President, Angel Oddo. As such, is would not be possible to compare jobs from the MLTSS side of Optima with jobs from the Behavioral Health side of Optima.

5. All ICMs must have an RN Degree and three years of nursing experience. They also must have active license as an RN.

6. Employees working under the single title of ICM on the MLTSS side of Optima actually perform a variety of distinct and dissimilar jobs under a variety of separate sub Job Codes.

7. After the onboarding, each ICM receives additional one-on-one department-specific training. This includes training with department personnel.

8. Within the MLTSS Department, I am familiar with ICMs who perform exclusively case management work. They work directly with members, their families, and their medical team to ensure they receive proper services to meet their medical needs. Such ICMs are expected to speak with and visit the members frequently, review their entire medical history, ensure that all of their conditions are actually being treated, and make them aware of other possible treatment options. These specific ICMs follow up with the Member, helps them set up appointments, and provide insight into a plan of care for the Member. These ICMs are able to handle specific, high-risk cases. This can include patients with mental health conditions who

require in person evaluations, pregnant members, and those who are receiving Private Duty Nursing.

9. These specific MLTSS case management ICMs are predominantly field-based employees. They visit members and facilities throughout the day. Given their travel and member needs, they have more flexibility in their schedule since they have to meet the needs of the members. Analyzing the hours worked of such an employee would be very different than analyzing the hours of a utilization related ICM.

10. Within the MLTSS Department, I am also familiar with the ICMs who work exclusively with the Cypher Health Partnership. Despite the ICM title, this is separate and dissimilar job. The goal of this partnership is to reduce recidivism and readmissions to members. The ICMs connect with recently discharged members to ensure they receive the proper services to continue their path to recovery. This focus on newly discharged, members with high recidivism risks requires a different skillset than the other ICMs in the MLTSS Department. The Cypher Health Initiative ICMs work mainly in the office and work from 8:00 A.M. to 5:00 P.M. with a one-hour lunch break.

11. Another distinct job I am familiar with are MLTSS ICMs who perform only utilization review work. We sometimes referred to these ICMs as Research ICMs.

12. Research ICMs do not perform any case management work, and instead do purely utilization/authorization work. Unlike case management ICMs, Research ICMs exclusively are office based (at least prior to COVID) and have very minimal direct interaction with members/patients.

13. Research ICMs receive requests for services from medical providers and evaluate the medical necessity of the request. However, ICMs evaluate particularly complicated cases,

using their advanced medical background to determine medical necessity.  Research ICMs have broad authority to approve requests for services.  They use their medical background and education to evaluate the requested service to determine if it is medically necessary and covered under the plan.   In fact, while some cases can be simple, taking tens of minutes, other cases can be so complicated that the evaluation takes an entire day to determine if the request should be approved or not.  Where the request cannot be approved in whole or in part, the Research ICM sends a recommendation and explanation to the Medical Director.  Attached as Exhibit A is an example of a review performed by a Research ICM.  In this case, the ICM reviewed a request for a CPAP machine.  The ICM found that there was insufficient documentation to meet medical necessity standards.  However, the ICM used his or her specific knowledge to point out that the PSG study conducted did not appear to be accurate and flagged it for the Medical Director's review.

14. The separate jobs that fall under the MLTSS ICM general job title have changed substantially over time.  Employees who left in 2018 or early 2019 would have no direct knowledge of what these jobs currently do.

15. Plaintiffs, Edna Preau-Grier and Andrea Andaluz were employed as case management ICMs in the MLTSS side of Optima Health. They both started September of 2017. However, Ms. Preau-Grier stopped working for Optima in August 2018 and Ms. Andaluz stopped working for Optima in March of 2019.  Both Plaintiffs worked out of their home offices and visited members to perform their interviews and evaluations.  As such, the majority of their time was spent performing evaluations and determining and remedying gaps in care for their members.

16. Ms. Preau-Grier would have only been with Optima for around 11 months. Importantly she would not have been fully autonomous as an ICM until at least a few months into her employment. She would not have been at Optima long enough to understand the job requirements of all case management-ICMs within the MLTSS department—much less MLTSS ICMs performing on the Cypher Health Initiative, or Research ICMs.

17. Although Ms. Andaluz worked for Optima for a longer period of time, she still would not have sufficient knowledge of the Cypher Health Initiative ICMs given that the initiative had not begun until after she left, the Research ICMs, nor any of the ICMs on the Behavioral Health side of Optima.

18. The jobs performed by Ms. Andaluz and Ms. Preau-Grier are vastly different than the jobs performed by, for example, a research ICM. They are also vastly different than (for example) an Authorization Coordinator or a Clinical Claims Reviewer. Unlike Andaluz/Preau-Grier, these utilization reviews jobs are not field jobs, have almost no member/patient interaction, rely on separate guidelines, and produce vastly different work product.

19. I also supervise Clinical Claims Reviewers whose job is very different from any other jobs at Optima. CCRs must have an RN degree. In addition, due to the medical coding they must understand, they also receive 12-18 months of training to learn how to understand, evaluate, and make determinations regarding the medical coding guidelines Optima uses. CCRs perform medical coding functions on behalf of Optima. They review certain claim payments that are not automatically paid by the Optima payment system. CCRs use their clinical and medical coding knowledge to evaluate complex medical services and ensure that they can determine an appropriate code in which these services fit. They review the entire care package, including claim information and provider documentation to determine if the services meet medical

necessity and to ensure they are (or can be) coded correctly. Upon making such determination, the CCR will either approve the claim or prepare their recommendation for final denial from the medical director. However, there are instances in which the CCR may make the denial without input from the Medical Director, making them different from other employees referenced herein.

20. These employees are not really considered care managers or utilization review employees whatsoever. CCRs have absolutely no member interaction. They work two to three days a week from home and the remainder in the office. This schedule is unique when compared to the other positions, and they often have schedules that are outside of normal business hours.

21. There are essentially no similarities between the role of a CCR and that of an ICM performing case management functions—like Mr. Preau-Grier and Ms. Andaluz, nor Ms. Edwards nor Ms. Harris. Their work hours, location, and services provided are all different. Clearly, the CCRs are nothing like the positions held by any of the named Plaintiffs.

22. I also have supervised Authorization Coordinators. They must have an LPN Degree and three years of related experience because of the medical evaluations and processes they must understand and evaluate. This is a purely utilization review related job.

23. Authorization Coordinators receive a service authorization request from the health care provider regarding requested services for the member, usually by means of a phone call, fax, or email received by an Authorization Secretary.

24. The Authorization Coordinator then confirms that the member is active and the health care provider is a participating provider in the Optima network. They review the clinical information provided to determine if it matches up with clinical guidelines. If, based on their exercise of discretion and knowledge, it clearly meets the guidelines, then they approve it. If

they cannot determine that it meets the explicit clinical criteria, then they pass it along to an RN who will conduct additional review.

25. Authorization Coordinators have occasional member contact throughout the day that they generally perform telephonically. They generally work a traditional work schedule (8:00 A.M. to 5:00 P.M. and a one hour lunch break).

26. In early 2019, we switched authorization coordinators to hourly employees. In the event any worked more than 40 hours, they would receive overtime.

27. This job is much different than the job performed by Plaintiffs, all of who had advanced degrees. Authorization Coordinators' in the MLTSS side of Optima perform roles that are very distinct from those of Plaintiffs Preau-Grier and Andaluz, and from the other Plaintiffs They do not provide any case management type work. They work in an office environment and have no face to face member interaction or travel requirement.

I declare under the penalty of perjury that the contents of the foregoing paper are true and correct to the best of my knowledge, information and belief.

Dated ____8/26/2020_____        __*Andrea Costen*_____
                            Andrea Costen

# **EXHIBIT A**



4417 Corporation Lane
Virginia Beach, Virginia 23462
www.optimahealth.com

UM/Authorization Request

| **General** | Research ICM Example 3 |
|---|---|
| Authorization ID: | |
| Plan Type: | HMO (Optima ID) | N/A (Optima ID #2) |
| Member ID for Auth: | * |
| Priority: | (If available will display here) Fax/Portal Routine |
| Timeliness: | Nonurgent Preservice |
| Requested Service: | Outpatient Medical |
| Received Date/Time: | 07/02/2020 10:29 Represents date/time fax, portal or call received |
| Created: | 07/02/2020 10:31 | Started: 07/06/2020 16:25 |
| Enrollment Date: | 07/01/2019 Disenrollment Date: |
| Estimated Date of Confinement: | | First OB Visit: |
| REQUEST TYPE | |
| Authorization Category: | Outpatient |
| Primary Type: | Outpatient |
| Show Authorization Type Reference | |
| IP: | No |
| Authorization Type: | REF |
| REQUESTING PROVIDER | |
| Please use this Search link to populate the fields below. Do not type directly. Last Name: City:         CHESAPEAKE        State  VA Provider ID: | |
| SERVICING PROVIDER/FACILITY | |
| Please use this Search link to populate the fields below. Do not type directly. Last Name: City:         CHESAPEAKE  State  VA Provider ID: | |
| Please use this Search link to populate the fields below. Do not type directly. Last Name: City:         CHESAPEAKE  State  VA Provider ID: | |
| REQUEST DETAILS | |



4417 Corporation Lane  
Virginia Beach, Virginia 23462  
www.optimahealth.com

## UM/Authorization Request

| | |
|---|---|
| Requested Date of Service from: | 08/05/2020 to 08/05/2020 |
| Requested Units of Service: | 1  Unit Type: Units |
| Dates of Service: | 08/05/2020 to 11/04/2020 |
| Approved Units of Service: | 0  Unit Type: Units |
| Discharge Date: | To: |
| Certified Days: | Denied Days: |
| Extension: | |

### ADDITIONAL DETAILS

| | |
|---|---|
| Type: | |
| Early Intervention: | Infertility: |
| Letter of Agreement: | Patient Pay |
| Elective Admission: | |
| EPSDT: | |
| Referral Type: | |

### DIAGNOSIS / PROCEDURE

| ICD-10 | Description |
|---|---|
| G47.33 | OBSTRUCTIVE SLEEP APNEA |

| Procedure Codes | Description |
|---|---|
| 95811 | POLYSOM 6->YRS CPAP 4-> PARM: McmRev |

**MCG CRITERIA (NEW OR EDIT EXISTING)**

Not Met  Notes: A-0338   CPAP Titration, Sleep Center

### Non-Clinical Review

Ready for Non-Clinical Review  Yes

**AUTHORIZATION STATUS**

PENDING PA NURSE REVIEW | Forward to:    | PA (OHCC)  For Pre-Authorization Use

### PA Nurse Review

Ready for PA Nurse Review  Yes

**AUTHORIZATION STATUS**



4417 Corporation Lane
Virginia Beach, Virginia 23462
www.optimahealth.com

UM/Authorization Request

| | |
|---|---|
| PENDING RN REVIEW | Forward to: RN | |
| Note: | 07/08/20 @ 1650  PVR IS PAR.  PER CLINCAL REVIEW, CRITERIA NOT MET FOR INLAB TITRATION CPT CODE 95811.  PENDING TO RN FOR REVIEW |

## RN Review

Ready for RN Review  Yes

### AUTHORIZATION STATUS

PENDING MD REVIEW | Forward to: MD
Referred from:
Pending Medical Director Review,
UM MD Response – Initial, Importance: High, Date Due: 07/10/2020 Pending Medical Director Review

### RN Note to Medical Director

Situation:
REQUEST FOR PSG AND CPAP TITRATION IN FACILITY

Background:
32 YR MALE WITH HX OF SNORING, DREAMS AND NOCTURIA, AWAKENS UNREFRESHED, MORNING HEADACHES, ESS2 HAD HOME SLEEP STUDY WHICH WAS NORMAL-AHI 2, LOWEST O2 DESAT IS 93%.

Assessment:
PER MCG A-0338 DOES NOT MEET FOR INFACILITY CPAP TITRATION NO CONTRAINDICATION TO HOME CPAP TITRATION  Medical necessity is not supported for the requested procedure because there was no documentation of the following : Home CPAP titration not an option, as indicated by 1 or more of the following:
• Chronic obstructive pulmonary disease or other lung disease; or
• Heart failure; or
• No  well supported home CPAP titration services available; or
• Obesity hypoventilation syndrome; or
• Patient does not have ability to manage equipment.

Recommendation:
DENY NMN FOR IN-FACILITY? THE HOME SLEEP PSG STUDY DID NOT APPEAR ACCURATE? OR APPROVE AS ATTENDED PSG AND CPAP NEEDS TO BE DONE IN FACILITY.

## Authorization Comments

Comment 1:  CSC Field 19 (Viewable in FAX)
DENIED PER MEDICAL DIRECTOR



4417 Corporation Lane
Virginia Beach, Virginia 23462
www.optimahealth.com

UM/Authorization Request

---

Comment 2:  CSC PL (Claims)
7/10/2020  DENIED D84F PER DR  FOR INFACILITY SLEEP STUDY DOES NOT MEET MCG A-0338 NO CONTRAINDICATION TO HOME CPAP TITRATION  Medical necessity is not supported for the requested procedure because there was no documentation of the following : Home CPAP titration not an option, as indicated by 1 or more of the following:
• Chronic obstructive pulmonary disease or other lung disease; or
• Heart failure; or
• No  well supported home CPAP titration services available; or
• Obesity hypoventilation syndrome; or
• Patient does not have ability to manage equipment.
NOTIFIED ALICIA RE; DENIAL/REASON PEER TO PEER AND APPEALS OPTIONS AUTOFAX AND DENIAL LETTER SENT.

## Medical Director Review

Ready for MD Review
Initial Determination

### INITIAL DETERMINATION

| DENIED (Not Medically Necessary) | Not medically necessary | Determination Date/Time: | 07/10/2020 15:11 | Forward to : | Return Review |
|---|---|---|---|---|---|

Return to RN for Completion,
UM Response, Importance: Critical, Date Due: 07/07/2020 Return to RN for Completion

Medical Director Comments:
NMN

## Denial Letter

Ready for Denial Letter  Yes

| Denial Letter Mailed to Provider: | 07/13/2020 12:30 | Provider Name: | | |
|---|---|---|---|---|
| Denial Letter Mailed to Member: | 07/13/2020 12:30 | Forward to: | Auth Archive | Please manually close Auth after this step. |