# **EXHIBIT 4**

## 28 U.S.C. § 1746 DECLARATION OF ~~NIKIA EDWARDS~~NATALIE HARRIS IN SUPPORT OF PROCEEDING AS A COLLECTIVE ACTION

I am over the age of 18, am competent to testify to the following from personal experience and knowledge, and declare as follows:

1. Optima Health Plan and Sentara Health Plans, Inc. ("Defendant") employed me and other workers ("Care Management Employees" or "CMEs") to perform the ongoing, day-to-day care management services that Defendant provides to its customers.

2. The utilization review and case management duties performed by me and other CMEs consisted of collecting information to document insured individuals' medical circumstances (data collection); inputting that information into Defendant's computer system (data entry); using established guidelines to maximize utilization of plan resources through the application of predetermined criteria (utilization management); coordinating care by arranging appointments and referrals and obtaining necessary authorizations from individuals (care coordination); educating members about their health plan (plan education); and other similar work (collectively, "Care Management Work").

3. Defendant employed me as a CME from approximately ~~July~~**June** 2018 to ~~November~~**December** 2018. Defendant referred to my job title in multiple ways during my employment, including referring to me as a **Care Coordinator,** Behavioral Health Care Coordinator, **and** Utilization Review Manager~~, and Care Coordinator~~. Regardless of the way Defendant referred to my position, my job duties primarily consisted of non- clinical Care Management Work.

4. Defendant did not require a bachelor's degree in any specific field or any specific certification to perform the work required of the position(s) I held during my employment.

5. Because my actions as a CME were constrained by Defendant's policies and guidelines, I did not exercise discretion and judgment in the performance of my job duties. As a CME, I performed my work in accordance with Defendant's policies and procedures and the guidelines embedded in Defendant's computer software. Defendant provided me with training on how to use these decision-making tools to perform my work in a consistent manner. In fact, Defendant's guidelines were comprehensive and detailed a course of action for nearly every contingency I encountered in performing my duties. I could not significantly deviate from these guidelines to perform my work, and under no circumstances did I have the authority to deny a member's request for a service or benefit. This is because Defendant had a strict policy that prohibited anyone other than a physician from denying a member's request for a service or benefit.

6. As a CME, I did not have the authority or discretion to hire or fire; interview job applicants; recommend merit or performance raises; transfer or rehire employees; discipline other employees; formulate employment policies; determine staffing levels; schedule the hours of other employees; set operational standards; or contractually commit Defendant to third parties. I did not regularly direct the work of two or more of employees or contractors employed by Defendant or its customers during my employment as a CME.

7. During my employment as a CME, I did not work in management or in any way influence the manner in which Defendant or its customers conducted business. I did not (1) have the authority to

formulate, effect, interpret or implement management or operating practices for Defendant or its customers; (2) plan short-term or long-term business objectives for Defendant or its customers; (3) carry out major assignments to conduct business for Defendant or its customers; (4) have the authority to bind Defendant or its customers to serious financial obligations; or (5) have the authority to waive or deviate from established policies and procedures without prior approval. Rather, I merely followed the policies, procedures, and guidelines set by Defendant and its management. Instead of running Defendant's business, my primary job as a CME was producing the utilization review and case management services Defendant provides to its customers.

8. As a CME, I did not provide direct clinical care, engage in bedside nursing, or exercise clinical judgment to diagnose or provide medical care. I did not diagnose or determine the treatment plan for individuals, nor was I allowed to modify such treatment plans, which were *always* prescribed by such individuals' primary care physician or other medical provider.

9. I performed my work as a CME in a call center environment. Defendant provided me with necessary computer equipment and electronic access to perform my work in this manner. Regardless of where I performed my work, my primary job duties continued to primarily consist of performing Care Management Work.

10. I routinely worked over 40 hours per week during my employment as a CME, averaging approximately 45 50 hours per week. Instead of paying us overtime for our regular overtime work, Defendant classified me and other CMEs as exempt, paid us on a salary basis, and failed to pay us overtime pay for all overtime hours we worked. Defendant paid me in this manner throughout my employment as a CME.

11. Based on my experience working for Defendant, I understand that Defendant has employed at least 100 CMEs in Virginia that work/worked under the same or similar conditions as I did during my employment. Like me, other salaried CMEs primarily performed Care Management Work, regularly worked overtime, and were denied overtime pay because they were subjected to the same policy that denied me overtime pay. The duties, hours and pay policies did not depend on the geographic area or region worked, but were rather a product of working as CMEs for Defendant. I base my belief and knowledge of Defendant's companywide policies on (1) conversations I had with other CMEs who talked with me about their job duties, hours of work, and how Defendant paid them during their employment; (2) training calls/webinars that I attended with CMEs; (3) training seminars I attended with other CMEs from across the state; and (4) observing other individuals performing the same job duties and working similar hours.

12. I believe other individuals would join this case if they were aware of its existence. I do not presently recall the names, telephone numbers, and addresses of all of the individuals with whom I was familiar while working for Defendant; however, I believe multiple other CMEs I worked with would join this case (or may have already done so) or would be eligible to do so if they knew of its existence and were not afraid of retaliation.

13. Based on conversations I had with my co-workers during my employment, I know that other CMEs and I rely heavily on our cell phones and computers for both personal and professional communications. I personally use my cell phone and computer to communicate with friends, family and attorneys through email, text message, and phone calls. In fact, while working for Defendant, managers and other co-workers would contact me on my cell phone about work. Although I receive

mail, I also routinely receive a significant amount of junk mail. If I did not know anything about this case, I would be far more likely to receive and read a notice that was emailed and texted to me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 8/31/2020.

DocuSigned by:

MJ Harris

B3D92A1078684C4...

### 28 U.S.C. § 1746 DECLARATION OF ~~NIKIA EDWARDS~~**ANDREA ANDALUZ** IN SUPPORT OF PROCEEDING AS A COLLECTIVE ACTION

I am over the age of 18, am competent to testify to the following from personal experience and knowledge, and declare as follows:

1. Optima Health Plan and Sentara Health Plans, Inc. ("Defendant") employed me and other workers ("Care Management Employees" or "CMEs") to perform the ongoing, day-to-day care management services that Defendant provides to its customers.

2. The utilization review and case management duties performed by me and other CMEs consisted of collecting information to document insured individuals' medical circumstances (data collection); inputting that information into Defendant's computer system (data entry); using established guidelines to maximize utilization of plan resources through the application of predetermined criteria (utilization management); coordinating care by arranging appointments and referrals and obtaining necessary authorizations from individuals (care coordination); educating members about their health plan (plan education); and other similar work (collectively, "Care Management Work").

3. Defendant employed me as a CME from approximately ~~July 2018~~**September 2017** to ~~November 2018.~~**March 2019.** Defendant referred to my job title in multiple ways during my employment, including referring to me as a ~~Behavioral Health~~ Care Coordinator~~, Utilization Review Manager,~~ and **an Integrated** Care ~~Coordinator~~**Manager**. Regardless of the way Defendant referred to my position, my job duties primarily consisted of non- clinical Care Management Work.

4. Defendant did not require a bachelor's degree in any specific field ~~or any specific certification~~ to perform the work required of the position(s) I held during my employment.

5. Because my actions as a CME were constrained by Defendant's policies and guidelines, I did not exercise discretion and judgment in the performance of my job duties. As a CME, I performed my work in accordance with Defendant's policies and procedures and the guidelines embedded in Defendant's computer software. Defendant provided me with training on how to use these decision-making tools to perform my work in a consistent manner. In fact, Defendant's guidelines were comprehensive and detailed a course of action for nearly every contingency I encountered in performing my duties. I could not significantly deviate from these guidelines to perform my work, and under no circumstances did I have the authority to deny a member's request for a service or benefit. This is because Defendant had a strict policy that prohibited anyone other than a physician from denying a member's request for a service or benefit.

6. As a CME, I did not have the authority or discretion to hire or fire; interview job applicants; recommend merit or performance raises; transfer or rehire employees; discipline other employees; formulate employment policies; determine staffing levels; schedule the hours of other employees; set operational standards; or contractually commit Defendant to third parties. I did not regularly direct the work of two or more of employees or contractors employed by Defendant or its customers during my employment as a CME.

ring my employment as a CME, I did not work in management or in any way influence the manner in which fendant or its customers conducted business. I did not (1) have the authority to formulate, effect, interpret or lement management or operating practices for Defendant or its

customers; (2) plan short-term or long-term business objectives for Defendant or its customers; (3) carry out major assignments to conduct business for Defendant or its customers; (4) have the authority to bind Defendant or its customers to serious financial obligations; or (5) have the authority to waive or deviate from established policies and procedures without prior approval. Rather, I merely followed the policies, procedures, and guidelines set by Defendant and its management. Instead of running Defendant's business, my primary job as a CME was producing the utilization review and case management services Defendant provides to its customers.

7. As a CME, I did not provide direct clinical care, engage in bedside nursing, or exercise clinical judgment to diagnose or provide medical care. I did not diagnose or determine the treatment plan for individuals, nor was I allowed to modify such treatment plans, which were *always* prescribed by such individuals' primary care physician or other medical provider.

8. I performed my work as a CME ~~in a call center environment~~**remotely from a combination of locations including my home and locations where I met with members**. Defendant provided me with necessary computer equipment and electronic access to perform my work in this manner. Regardless of where I performed my work, my primary job duties continued to primarily consist of performing Care Management Work.

9. I routinely worked over 40 hours per week during my employment as a CME, averaging approximately ~~45~~**50 to 55** hours per week. Instead of paying us overtime for our regular overtime work, Defendant classified me and other CMEs as exempt, paid us on a salary basis, and failed to pay us overtime pay for all overtime hours we worked. Defendant paid me in this manner throughout my employment as a CME.

10. Based on my experience working for Defendant, I understand that Defendant has employed at least 100 CMEs in Virginia that work/worked under the same or similar conditions as I did during my employment. Like me, other salaried CMEs primarily performed Care Management Work, regularly worked overtime, and were denied overtime pay because they were subjected to the same policy that denied me overtime pay. The duties, hours and pay policies did not depend on the geographic area or region worked, but were rather a product of working as CMEs for Defendant. I base my belief and knowledge of Defendant's companywide policies on (1) conversations I had with other CMEs who talked with me about their job duties, hours of work, and how Defendant paid them during their employment; (2) training calls/webinars that I attended with CMEs; (3) training seminars I attended with other CMEs from across the state; and (4) observing other individuals performing the same job duties and working similar hours.

11. I believe other individuals would join this case if they were aware of its existence. I do not presently recall the names, telephone numbers, and addresses of all of the individuals with whom I was familiar while working for Defendant; however, I believe multiple other CMEs I worked with would join this case (or may have already done so) or would be eligible to do so if they knew of its existence and were not afraid of retaliation.

12. Based on conversations I had with my co-workers during my employment, I know that other CMEs and I rely heavily on our cell phones and computers for both personal and professional communications. I personally use my cell phone and computer to communicate with friends, family and attorneys through email, text message, and phone calls. In fact, while working for Defendant, managers and other co-workers would contact me on my cell phone about work. Although I receive

mail, I also routinely receive a significant amount of junk mail. If I did not know anything about this case, I would be far more likely to receive and read a notice that was emailed and texted to me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  8/31/2020  .

DocuSigned by:

Joshua Cordely

930ACA9E44AE4CD...

### 28 U.S.C. § 1746 DECLARATION OF ~~NATALIE HARRIS~~ANDREA ANDALUZ IN SUPPORT OF PROCEEDING AS A COLLECTIVE ACTION

I am over the age of 18, am competent to testify to the following from personal experience and knowledge, and declare as follows:

1. Optima Health Plan and Sentara Health Plans, Inc. ("Defendant") employed me and other workers ("Care Management Employees" or "CMEs") to perform the ongoing, day-to-day care management services that Defendant provides to its customers.

2. The utilization review and case management duties performed by me and other CMEs consisted of collecting information to document insured individuals' medical circumstances (data collection); inputting that information into Defendant's computer system (data entry); using established guidelines to maximize utilization of plan resources through the application of predetermined criteria (utilization management); coordinating care by arranging appointments and referrals and obtaining necessary authorizations from individuals (care coordination); educating members about their health plan (plan education); and other similar work (collectively, "Care Management Work").

3. Defendant employed me as a CME from approximately ~~June 2018~~September 2017 to ~~December 2018.~~March 2019. Defendant referred to my job title in multiple ways during my employment, including referring to me as a Care Coordinator~~, Behavioral Health Care Coordinator, and Utilization Review~~ and an Integrated Care Manager. Regardless of the way Defendant referred to my position, my job duties primarily consisted of non- clinical Care Management Work.

4. Defendant did not require a bachelor's degree in any specific field ~~or any specific certification~~ to perform the work required of the position(s) I held during my employment.

5. Because my actions as a CME were constrained by Defendant's policies and guidelines, I did not exercise discretion and judgment in the performance of my job duties. As a CME, I performed my work in accordance with Defendant's policies and procedures and the guidelines embedded in Defendant's computer software. Defendant provided me with training on how to use these decision-making tools to perform my work in a consistent manner. In fact, Defendant's guidelines were comprehensive and detailed a course of action for nearly every contingency I encountered in performing my duties. I could not significantly deviate from these guidelines to perform my work, and under no circumstances did I have the authority to deny a member's request for a service or benefit. This is because Defendant had a strict policy that prohibited anyone other than a physician from denying a member's request for a service or benefit.

6. As a CME, I did not have the authority or discretion to hire or fire; interview job applicants; recommend merit or performance raises; transfer or rehire employees; discipline other employees; formulate employment policies; determine staffing levels; schedule the hours of other employees; set operational standards; or contractually commit Defendant to third parties. I did not regularly direct the work of two or more of employees or contractors employed by Defendant or its customers during my employment as a CME.

ring my employment as a CME, I did not work in management or in any way influence the manner in which fendant or its customers conducted business. I did not (1) have the authority to formulate, effect, interpret or lement management or operating practices for Defendant or its

customers; (2) plan short-term or long-term business objectives for Defendant or its customers; (3) carry out major assignments to conduct business for Defendant or its customers; (4) have the authority to bind Defendant or its customers to serious financial obligations; or (5) have the authority to waive or deviate from established policies and procedures without prior approval. Rather, I merely followed the policies, procedures, and guidelines set by Defendant and its management. Instead of running Defendant's business, my primary job as a CME was producing the utilization review and case management services Defendant provides to its customers.

7. As a CME, I did not provide direct clinical care, engage in bedside nursing, or exercise clinical judgment to diagnose or provide medical care. I did not diagnose or determine the treatment plan for individuals, nor was I allowed to modify such treatment plans, which were *always* prescribed by such individuals' primary care physician or other medical provider.

8. I performed my work as a CME ~~in a call center environment~~**remotely from a combination of locations including my home and locations where I met with members**. Defendant provided me with necessary computer equipment and electronic access to perform my work in this manner. Regardless of where I performed my work, my primary job duties continued to primarily consist of performing Care Management Work.

9. I routinely worked over 40 hours per week during my employment as a CME, averaging approximately 50 **to 55** hours per week. Instead of paying us overtime for our regular overtime work, Defendant classified me and other CMEs as exempt, paid us on a salary basis, and failed to pay us overtime pay for all overtime hours we worked. Defendant paid me in this manner throughout my employment as a CME.

10. Based on my experience working for Defendant, I understand that Defendant has employed at least 100 CMEs in Virginia that work/worked under the same or similar conditions as I did during my employment. Like me, other salaried CMEs primarily performed Care Management Work, regularly worked overtime, and were denied overtime pay because they were subjected to the same policy that denied me overtime pay. The duties, hours and pay policies did not depend on the geographic area or region worked, but were rather a product of working as CMEs for Defendant. I base my belief and knowledge of Defendant's companywide policies on (1) conversations I had with other CMEs who talked with me about their job duties, hours of work, and how Defendant paid them during their employment; (2) training calls/webinars that I attended with CMEs; (3) training seminars I attended with other CMEs from across the state; and (4) observing other individuals performing the same job duties and working similar hours.

11. I believe other individuals would join this case if they were aware of its existence. I do not presently recall the names, telephone numbers, and addresses of all of the individuals with whom I was familiar while working for Defendant; however, I believe multiple other CMEs I worked with would join this case (or may have already done so) or would be eligible to do so if they knew of its existence and were not afraid of retaliation.

12. Based on conversations I had with my co-workers during my employment, I know that other CMEs and I rely heavily on our cell phones and computers for both personal and professional communications. I personally use my cell phone and computer to communicate with friends, family and attorneys through email, text message, and phone calls. In fact, while working for Defendant, managers and other co-workers would contact me on my cell phone about work. Although I receive

mail, I also routinely receive a significant amount of junk mail. If I did not know anything about this case, I would be far more likely to receive and read a notice that was emailed and texted to me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __8/1/2020__.

NA

DocuSigned by: Bladua Cordoly
930ACA9E44AE4CD...

### 28 U.S.C. § 1746 DECLARATION OF ~~EDNA PREAU-GRIER~~**ANDREA ANDALUZ** IN SUPPORT OF PROCEEDING AS A COLLECTIVE ACTION

I am over the age of 18, am competent to testify to the following from personal experience and knowledge, and declare as follows:

1. Optima Health Plan and Sentara Health Plans, Inc. ("Defendant") employed me and other workers ("Care Management Employees" or "CMEs") to perform the ongoing, day-to-day care management services that Defendant provides to its customers.

2. The utilization review and case management duties performed by me and other CMEs consisted of collecting information to document insured individuals' medical circumstances (data collection); inputting that information into Defendant's computer system (data entry); using established guidelines to maximize utilization of plan resources through the application of predetermined criteria (utilization management); coordinating care by arranging appointments and referrals and obtaining necessary authorizations from individuals (care coordination); educating members about their health plan (plan education); and other similar work (collectively, "Care Management Work").

3. Defendant employed me as a CME from approximately September 2017 to ~~August 2018.~~ **March 2019.** Defendant referred to my job title in multiple ways during my employment, including referring to me as a Care Coordinator~~,~~ **and an** Integrated Care Manager~~, and RN LTSS Care Coordinator~~. Regardless of the way Defendant referred to my position, my job duties primarily consisted of non-clinical Care Management Work.

4. Defendant did not require a bachelor's degree in any specific field to perform the work required of the position(s) I held during my employment.

5. Because my actions as a CME were constrained by Defendant's policies and guidelines, I did not exercise discretion and judgment in the performance of my job duties. As a CME, I performed my work in accordance with Defendant's policies and procedures and the guidelines embedded in Defendant's computer software. Defendant provided me with training on how to use these decision-making tools to perform my work in a consistent manner. In fact, Defendant's guidelines were comprehensive and detailed a course of action for nearly every contingency I encountered in performing my duties. I could not significantly deviate from these guidelines to perform my work, and under no circumstances did I have the authority to deny a member's request for a service or benefit. This is because Defendant had a strict policy that prohibited anyone other than a physician from denying a member's request for a service or benefit.

6. As a CME, I did not have the authority or discretion to hire or fire; interview job applicants; recommend merit or performance raises; transfer or rehire employees; discipline other employees; formulate employment policies; determine staffing levels; schedule the hours of other employees; set operational standards; or contractually commit Defendant to third parties. I did not regularly direct the work of two or more of employees or contractors employed by Defendant or its customers during my employment as a CME.

ring my employment as a CME, I did not work in management or in any way influence the manner in which fendant or its customers conducted business. I did not (1) have the authority to formulate, effect, interpret or lement management or operating practices for Defendant or its

customers; (2) plan short-term or long-term business objectives for Defendant or its customers; (3) carry out major assignments to conduct business for Defendant or its customers; (4) have the authority to bind Defendant or its customers to serious financial obligations; or (5) have the authority to waive or deviate from established policies and procedures without prior approval. Rather, I merely followed the policies, procedures, and guidelines set by Defendant and its management. Instead of running Defendant's business, my primary job as a CME was producing the utilization review and case management services Defendant provides to its customers.

7. As a CME, I did not provide direct clinical care, engage in bedside nursing, or exercise clinical judgment to diagnose or provide medical care. I did not diagnose or determine the treatment plan for individuals, nor was I allowed to modify such treatment plans, which were *always* prescribed by such individuals' primary care physician or other medical provider.

8. I performed my work as a CME remotely from a combination of locations including my home and locations where I met with members. Defendant provided me with necessary computer equipment and electronic access to perform my work in this manner. Regardless of where I performed my work, my primary job duties continued to primarily consist of performing Care Management Work.

9. I routinely worked over 40 hours per week during my employment as a CME, averaging approximately 50 to ~~60~~**55** hours per week. Instead of paying us overtime for our regular overtime work, Defendant classified me and other CMEs as exempt, paid us on a salary basis, and failed to pay us overtime pay for all overtime hours we worked. Defendant paid me in this manner throughout my employment as a CME.

10. Based on my experience working for Defendant, I understand that Defendant has employed at least 100 CMEs in Virginia that work/worked under the same or similar conditions as I did during my employment. Like me, other salaried CMEs primarily performed Care Management Work, regularly worked overtime, and were denied overtime pay because they were subjected to the same policy that denied me overtime pay. The duties, hours and pay policies did not depend on the geographic area or region worked, but were rather a product of working as CMEs for Defendant. I base my belief and knowledge of Defendant's companywide policies on (1) conversations I had with other CMEs who talked with me about their job duties, hours of work, and how Defendant paid them during their employment; (2) training calls/webinars that I attended with CMEs; (3) training seminars I attended with other CMEs from across the state; and (4) observing other individuals performing the same job duties and working similar hours.

11. I believe other individuals would join this case if they were aware of its existence. I do not presently recall the names, telephone numbers, and addresses of all of the individuals with whom I was familiar while working for Defendant; however, I believe multiple other CMEs I worked with would join this case (or may have already done so) or would be eligible to do so if they knew of its existence and were not afraid of retaliation.

12. Based on conversations I had with my co-workers during my employment, I know that other CMEs and I rely heavily on our cell phones and computers for both personal and professional communications. I personally use my cell phone and computer to communicate with friends, family and attorneys through email, text message, and phone calls. In fact, while working for Defendant, managers and other co-workers would contact me on my cell phone about work. Although I receive

mail, I also routinely receive a significant amount of junk mail. If I did not know anything about this case, I would be far more likely to receive and read a notice that was emailed and texted to me.

I declare under penalty of perjury that the foregoing is true and correct.

    Executed on __8/1/2020__.

                                                    DocuSigned by: [signature] 930ACA9E44AE4CD...

**28 U.S.C. § 1746 DECLARATION OF ~~NIKIA EDWARDS~~EDNA PREAU-GRIER IN SUPPORT OF PROCEEDING AS A COLLECTIVE ACTION**

I am over the age of 18, am competent to testify to the following from personal experience and knowledge, and declare as follows:

1. Optima Health Plan and Sentara Health Plans, Inc. ("Defendant") employed me and other workers ("Care Management Employees" or "CMEs") to perform the ongoing, day-to-day care management services that Defendant provides to its customers.

2. The utilization review and case management duties performed by me and other CMEs consisted of collecting information to document insured individuals' medical circumstances (data collection); inputting that information into Defendant's computer system (data entry); using established guidelines to maximize utilization of plan resources through the application of predetermined criteria (utilization management); coordinating care by arranging appointments and referrals and obtaining necessary authorizations from individuals (care coordination); educating members about their health plan (plan education); and other similar work (collectively, "Care Management Work").

3. Defendant employed me as a CME from approximately ~~July 2018~~September 2017 to ~~November~~August 2018. Defendant referred to my job title in multiple ways during my employment, including referring to me as a ~~Behavioral Health~~ Care Coordinator, ~~Utilization Review~~Integrated Care Manager, and RN LTSS Care Coordinator. Regardless of the way Defendant referred to my position, my job duties primarily consisted of non- clinical Care Management Work.

4. Defendant did not require a bachelor's degree in any specific field ~~or any specific certification~~ to perform the work required of the position(s) I held during my employment.

5. Because my actions as a CME were constrained by Defendant's policies and guidelines, I did not exercise discretion and judgment in the performance of my job duties. As a CME, I performed my work in accordance with Defendant's policies and procedures and the guidelines embedded in Defendant's computer software. Defendant provided me with training on how to use these decision-making tools to perform my work in a consistent manner. In fact, Defendant's guidelines were comprehensive and detailed a course of action for nearly every contingency I encountered in performing my duties. I could not significantly deviate from these guidelines to perform my work, and under no circumstances did I have the authority to deny a member's request for a service or benefit. This is because Defendant had a strict policy that prohibited anyone other than a physician from denying a member's request for a service or benefit.

6. As a CME, I did not have the authority or discretion to hire or fire; interview job applicants; recommend merit or performance raises; transfer or rehire employees; discipline other employees; formulate employment policies; determine staffing levels; schedule the hours of other employees; set operational standards; or contractually commit Defendant to third parties. I did not regularly direct the work of two or more of employees or contractors employed by Defendant or its customers during my employment as a CME.

7. During my employment as a CME, I did not work in management or in any way influence the manner in which Defendant or its customers conducted business. I did not (1) have the authority to

formulate, effect, interpret or implement management or operating practices for Defendant or its customers; (2) plan short-term or long-term business objectives for Defendant or its customers; (3) carry out major assignments to conduct business for Defendant or its customers; (4) have the authority to bind Defendant or its customers to serious financial obligations; or (5) have the authority to waive or deviate from established policies and procedures without prior approval. Rather, I merely followed the policies, procedures, and guidelines set by Defendant and its management. Instead of running Defendant's business, my primary job as a CME was producing the utilization review and case management services Defendant provides to its customers.

8. As a CME, I did not provide direct clinical care, engage in bedside nursing, or exercise clinical judgment to diagnose or provide medical care. I did not diagnose or determine the treatment plan for individuals, nor was I allowed to modify such treatment plans, which were *always* prescribed by such individuals' primary care physician or other medical provider.

9. I performed my work as a CME ~~in a call center environment~~ **remotely from a combination of locations including my home and locations where I met with members**. Defendant provided me with necessary computer equipment and electronic access to perform my work in this manner. Regardless of where I performed my work, my primary job duties continued to primarily consist of performing Care Management Work.

10. I routinely worked over 40 hours per week during my employment as a CME, averaging approximately ~~45~~ **50 to 60** hours per week. Instead of paying us overtime for our regular overtime work, Defendant classified me and other CMEs as exempt, paid us on a salary basis, and failed to pay us overtime pay for all overtime hours we worked. Defendant paid me in this manner throughout my employment as a CME.

11. Based on my experience working for Defendant, I understand that Defendant has employed at least 100 CMEs in Virginia that work/worked under the same or similar conditions as I did during my employment. Like me, other salaried CMEs primarily performed Care Management Work, regularly worked overtime, and were denied overtime pay because they were subjected to the same policy that denied me overtime pay. The duties, hours and pay policies did not depend on the geographic area or region worked, but were rather a product of working as CMEs for Defendant. I base my belief and knowledge of Defendant's companywide policies on (1) conversations I had with other CMEs who talked with me about their job duties, hours of work, and how Defendant paid them during their employment; (2) training calls/webinars that I attended with CMEs; (3) training seminars I attended with other CMEs from across the state; and (4) observing other individuals performing the same job duties and working similar hours.

12. I believe other individuals would join this case if they were aware of its existence. I do not presently recall the names, telephone numbers, and addresses of all of the individuals with whom I was familiar while working for Defendant; however, I believe multiple other CMEs I worked with would join this case (or may have already done so) or would be eligible to do so if they knew of its existence and were not afraid of retaliation.

13. Based on conversations I had with my co-workers during my employment, I know that other CMEs and I rely heavily on our cell phones and computers for both personal and professional communications. I personally use my cell phone and computer to communicate with friends, family and attorneys through email, text message, and phone calls. In fact, while working for Defendant, managers and other co-workers would contact me on my cell phone about work. Although I receive

mail, I also routinely receive a significant amount of junk mail. If I did not know anything about this case, I would be far more likely to receive and read a notice that was emailed and texted to me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  8/3̶1̶/2020  .



NI**E** ~~~~ **R**

### 28 U.S.C. § 1746 DECLARATION OF ~~NATALIE HARRIS~~**EDNA PREAU-GRIER** IN SUPPORT OF PROCEEDING AS A COLLECTIVE ACTION

I am over the age of 18, am competent to testify to the following from personal experience and knowledge, and declare as follows:

1. Optima Health Plan and Sentara Health Plans, Inc. ("Defendant") employed me and other workers ("Care Management Employees" or "CMEs") to perform the ongoing, day-to-day care management services that Defendant provides to its customers.

2. The utilization review and case management duties performed by me and other CMEs consisted of collecting information to document insured individuals' medical circumstances (data collection); inputting that information into Defendant's computer system (data entry); using established guidelines to maximize utilization of plan resources through the application of predetermined criteria (utilization management); coordinating care by arranging appointments and referrals and obtaining necessary authorizations from individuals (care coordination); educating members about their health plan (plan education); and other similar work (collectively, "Care Management Work").

3. Defendant employed me as a CME from approximately ~~June 2018~~**September 2017** to ~~December~~**August** 2018. Defendant referred to my job title in multiple ways during my employment, including referring to me as a Care Coordinator, ~~Behavioral Health~~**Integrated Care Manager, and RN LTSS** Care Coordinator~~, and Utilization Review Manager~~. Regardless of the way Defendant referred to my position, my job duties primarily consisted of non- clinical Care Management Work.

4. Defendant did not require a bachelor's degree in any specific field ~~or any specific certification~~ to perform the work required of the position(s) I held during my employment.

5. Because my actions as a CME were constrained by Defendant's policies and guidelines, I did not exercise discretion and judgment in the performance of my job duties. As a CME, I performed my work in accordance with Defendant's policies and procedures and the guidelines embedded in Defendant's computer software. Defendant provided me with training on how to use these decision-making tools to perform my work in a consistent manner. In fact, Defendant's guidelines were comprehensive and detailed a course of action for nearly every contingency I encountered in performing my duties. I could not significantly deviate from these guidelines to perform my work, and under no circumstances did I have the authority to deny a member's request for a service or benefit. This is because Defendant had a strict policy that prohibited anyone other than a physician from denying a member's request for a service or benefit.

6. As a CME, I did not have the authority or discretion to hire or fire; interview job applicants; recommend merit or performance raises; transfer or rehire employees; discipline other employees; formulate employment policies; determine staffing levels; schedule the hours of other employees; set operational standards; or contractually commit Defendant to third parties. I did not regularly direct the work of two or more of employees or contractors employed by Defendant or its customers during my employment as a CME.

7. During my employment as a CME, I did not work in management or in any way influence the manner in which Defendant or its customers conducted business. I did not (1) have the authority to

formulate, effect, interpret or implement management or operating practices for Defendant or its customers; (2) plan short-term or long-term business objectives for Defendant or its customers; (3) carry out major assignments to conduct business for Defendant or its customers; (4) have the authority to bind Defendant or its customers to serious financial obligations; or (5) have the authority to waive or deviate from established policies and procedures without prior approval. Rather, I merely followed the policies, procedures, and guidelines set by Defendant and its management. Instead of running Defendant's business, my primary job as a CME was producing the utilization review and case management services Defendant provides to its customers.

8. As a CME, I did not provide direct clinical care, engage in bedside nursing, or exercise clinical judgment to diagnose or provide medical care. I did not diagnose or determine the treatment plan for individuals, nor was I allowed to modify such treatment plans, which were *always* prescribed by such individuals' primary care physician or other medical provider.

9. I performed my work as a CME ~~in a call center environment~~**remotely from a combination of locations including my home and locations where I met with members**. Defendant provided me with necessary computer equipment and electronic access to perform my work in this manner. Regardless of where I performed my work, my primary job duties continued to primarily consist of performing Care Management Work.

10. I routinely worked over 40 hours per week during my employment as a CME, averaging approximately 50 **to 60** hours per week. Instead of paying us overtime for our regular overtime work, Defendant classified me and other CMEs as exempt, paid us on a salary basis, and failed to pay us overtime pay for all overtime hours we worked. Defendant paid me in this manner throughout my employment as a CME.

11. Based on my experience working for Defendant, I understand that Defendant has employed at least 100 CMEs in Virginia that work/worked under the same or similar conditions as I did during my employment. Like me, other salaried CMEs primarily performed Care Management Work, regularly worked overtime, and were denied overtime pay because they were subjected to the same policy that denied me overtime pay. The duties, hours and pay policies did not depend on the geographic area or region worked, but were rather a product of working as CMEs for Defendant. I base my belief and knowledge of Defendant's companywide policies on (1) conversations I had with other CMEs who talked with me about their job duties, hours of work, and how Defendant paid them during their employment; (2) training calls/webinars that I attended with CMEs; (3) training seminars I attended with other CMEs from across the state; and (4) observing other individuals performing the same job duties and working similar hours.

12. I believe other individuals would join this case if they were aware of its existence. I do not presently recall the names, telephone numbers, and addresses of all of the individuals with whom I was familiar while working for Defendant; however, I believe multiple other CMEs I worked with would join this case (or may have already done so) or would be eligible to do so if they knew of its existence and were not afraid of retaliation.

13. Based on conversations I had with my co-workers during my employment, I know that other CMEs and I rely heavily on our cell phones and computers for both personal and professional communications. I personally use my cell phone and computer to communicate with friends, family and attorneys through email, text message, and phone calls. In fact, while working for Defendant, managers and other co-workers would contact me on my cell phone about work. Although I receive

mail, I also routinely receive a significant amount of junk mail. If I did not know anything about this case, I would be far more likely to receive and read a notice that was emailed and texted to me.

I declare under penalty of perjury that the foregoing is true and correct.

    Executed on __8/1/2020__.

DocuSigned by:<br>
*Edna Grier*<br>
~~NA~~**E**   A7528EFDE205408...   **R**